Francis Earl BROWN *v.*
Steven E. FLEMING et ux

CA 79-13                                    586 S.W. 2d 8

Opinion delivered August 22, 1979
and released for publication September 12, 1979

*Willis V. Lewis,* for appellant.

*Howell, Price, Howell, P.A.,* by: *Merl Barns,* for appellee.

M. STEELE HAYS, Judge. This case was appealed to the Arkansas Supreme Court and assigned to the Arkansas Court of Appeals pursuant to Rule 29(3).

Appellant appeals from a final order of adoption granted to appellee. The persons adopted are Michael Earl Brown and Christopher Allen Brown, minor sons of appellant and Eva Jeanette Fleming (formerly Brown). Appellant and Mrs. Fleming divorced on March 22, 1974 and on May 1, 1976, Mrs. Fleming married the appellee. In the decree of divorce, custody was awarded to Mrs. Fleming of Michael, then four years of age, and of Christopher, then ten months of age. Child support was set at $25.00 per week. On September 1, 1977, appellee filed petition for adoption of the two boys. Hearings were conducted on December 8, 1977, December 21, 1977 and on November 2, 1978, a final decree of adoption was entered. The testimony established that appellant had

seen his sons irregularly since the divorce and not at all since December of 1975, except for a single overnight visit in November, 1976. Appellant had paid nothing by his own account since December of 1975 (he testified that he was unemployed from May 1976 to March 1977) and had not attempted to see the children since 1975. Mrs. Fleming testified that the children loved the appellee and thought of him as their father and that he had provided the full and only support of the children since their marriage in 1976.

The lower court found that the appellant's consent was not necessary and that it was in the best interest of the children to grant the adoption. This appeal followed:

Two points for reversal are argued: I, that the presence of the children before the court is required by Ark. Stat. 56-214 (Act 735 of 1977) and the children were not before the court; and II, that the appellant's consent was necessary and was not lost to him by reason of non-support, as provided in Ark. Stat. 56-207. These points for reversal must fail.

As to the first point, the point lacks merit for the reason that the final decree of adoption recites "that all proper persons are before the court", and we must assume the finding means what it says. Moreover, counsel for appellee, who attended every one of the hearings, states categorically that the children were present at the hearing on December 21, 1977. This hearing was held approximately six months before counsel for appellant entered the case. But the answer need not rest on this reasoning alone, for it is clear that appellant's counsel made objections into the record at both the December 21, 1977 hearing (see page 50 of the record) and at the November 2, 1978 hearing (see pages 55-57 of the record) and neither objection touched on the point now argued. The rule in *Pyramid Life Insurance Company of Kansas City, Kansas* v. *Garrison,* 241 Ark. 101 (1966) 406 S.W. 2d 344, and *Panich* v. *McLendon,* 241 Ark. 576 (1966) 409 S.W. 2d 497 applies.

As to point II, section 7 of the Act (Ark. Stat. 56-207) provides that the consent to adoption is not required of a parent who, for one year has failed significantly without justifiable cause to communicate with his child *or* provide for

the care and support of his child as required by law or judicial decree.

The fact is the appellant is caught under both provisions in the statute. He admits that he did not see or otherwise communicate with his children from December of 1975 (except for one overnight visit with them in November, 1976) or, for a period of nearly two years. We are not willing to say that the court erred in holding that this was not significant communication. Appellant cites *Woodson* v. *Lee,* 221 Ark, 517, 254 S.W. 2d 326 (1953) in support of this point. The difference in the two cases are evident. In *Woodson,* the Supreme Court reversed a lower court ruling that a father had abandoned his son for a period in excess of six months. The facts in that case reflected that the father never stopped trying to see and communicate with his son but was denied the right to do so by the mother, his former wife. He eventually obtained counsel in an effort to enforce his right of visitation. In the present case, after 1975 appellant never attempted, so far as we can determine from the record, to see his children and his explanation is unconvincing.

On the matter of financial support, the records of the Master show that appellant began missing child support payments within a few months following the divorce. He paid a total of nine or ten payments in 1975 (as opposed to the requisite 52) and, by his own admission, paid nothing after December, 1975. His explanation is that he was unemployed from May 1976 until March, 1977. Even so, this interruption in earnings doesn't account for an extended period both before and after his period of unemployment. His explanation for not resuming support after he returned to work in March of 1977 was he needed to catch up on his bills. The obvious fact is that both from the standpoint of communication and financial support the appellant has demonstrated a disinterest in these children for a period well in excess of the period prescribed in the statute. The legislature has seen fit to fix the period by which the right of a parent to prevent, absolutely, the adoption of children by reason of significant failure to either support or cummunicate with children. It fixed that period of time at one year and the appellant comes clearly within that provision. That being so, the Probate

court was justified in finding that his consent was not required and by so holding, the court deprived appellant of nothing that he had not voluntarily surrendered long before. Affirmed.

Howard J., dissents.

GEORGE HOWARD, JR., Judge, dissenting. Ark. Stat. Ann. § 56-207, the revised Uniform Adoption Act, in relevant part, provides:

(a) Consent to adoption is not required of:

> "(2) a parent of a child in the custody of another, if the parent for a period of at least one (1) year *has failed significantly without justifiable cause* (i) to communicate with the child or (ii) to provide for the care and support of the child as required by law or judicial decree . . . " (Emphasis added)

The petitioners, the stepfather and natural mother of the minors, claimed, and the trial court accepted the contention, that appellant, the natural father, had "failed to provide for the care and support of the children as required by the divorce decree . . . for more than two years and, thus, his consent is not required . . . " But a careful review of the record clearly shows that this claim was not established by a preponderance of the evidence and a reversal of the trial court is required.

The mother of the minor children testified:

"Q. When was the last child support payment you received?

A. September, 1975.

. . .

Q. Immediately following your divorce did he visit the children regularly?

A. No.

Q. Has he ever visited the children regularly?

A. No, he hasn't.

Q. When was the last time he saw the children?

A. December of '75."

On cross examination, the mother testified:

"Q. So you don't know whether your former husband saw the children when his parents had them or not, do you?

A. I know a couple of times he did."

The natural father testified, in relevant part, as follows:

"Q. . . . Have you given her any money since that time (September 23, 1975)?

A. Yes, sir, I have. Not through the Court but personally.

Q. Personally? Did you give her any money in Christmas of '75?

A. Yes, sir, on Christmas Eve. I had sent her a check the week before, and then Christmas Eve when I stopped by her apartment on Baseline Road to pick up the kids I gave her $240.00 in cash.

. . .

Q. What Christmas was that? 1975?

A. Yes.

Q. All right. Have you given them any money since December of '75?

A. No, sir.

Q. Why haven't you given them any money since then?

A. Because up until May of this year I was unemployed from March of '76 until May of this year.

Q. Until May of this year?

A. Yes, sir.

Q. And were you able to give them any money?

A. No, sir, I wasn't.

. . .

Q. Have you tried to communicate with the children during this past — since December of '75?

A. The last time I talked with their mother we got into an argument and since she has remarried. I don't want to start any problem between her and her new husband.

Q. All right. Now, when did she remarry?

A. May of '76.

Q. All right. Did you communicate and visit with the children prior to the time that she remarried?

A. Yes, I did. In fact, the two summers after we were divorced, the first summer I had the oldest boy for a week in Memphis, and the second summer I had both of the boys for a week, when I was still living in Memphis.

Q. All right. Have you talked with them on the phone since she remarried?

A. I haven't talked to them on the phone. I saw them the first weekend in November of '76.

Q. The first weekend in November of '76? And where was that?

A. The night my father picked the boys up from her, that afternoon, and they spent Friday night with me over at the trailer, and then they went down to my grandparents the next morning.

Q. And that was in November of '76?

A. Yes, sir.

Q. And how old was the oldest one at this time?

A. The oldest one at that time was seven.

Q. Was seven? And you spent the night at your trailer?

A. Yes, sir.

Q. Have you tried to talk or communicate with your children by phone?

A. Well, sir, since my ex-wife has remarried she seems to be happy and I don't want to start any problems or cause any problems between her and Mr. Fleming."

On cross examination, the natural father testified:

"A. My ex-wife knew that I was unemployed."

The paternal grandmother of the minor children testified:

"Q. Have you bought the children presents?

A. Well, their Christmas presents are at my house now.

Q. From last year?

A. Yes, sir.

Q. Why are they at your house now?

A. From last Christmas? Well, I don't know. Just — I called Mrs. Fleming and asked her if she would come out and pick them up but she just didn't pick them up.

. . .

Q. Now, prior to the time that she remarried did you and your husband keep the kids on weekends?

A. Yes, sir.

Q. And have you had the children on any weekends since she remarried?

A. Yes. We had them after she got married until, I believe that it was the first weekend of November, of '76.

Q. And then that is the last time you have had them?

A. Yes.

Q. What happened that you ceased having the children on the weekend?

A. Well, when I would call, well, she just said they were going some place and she didn't think it was right for 'em to come out.

. . .

Q. But you have been denied the right to have them on weekends, have you not? Since November, '76, last year?

A. Yes, sir."

The paternal grandfather testified:

"Q. Have you given the children any presents, and so forth?

A. We bought them Christmas presents but they are still at home.

Q. Have you been denied the right to have the children out to your place?

A. I feel like I have, yes, sir.

Q. And up until then you used to keep them quite frequently, did you not?

A. Right.

Q. And what happened that caused that to cease?

A. Really I don't know."

The testimony of the natural father and paternal grandparents has not been rebutted. This testimony stands uncontradicted.

It is plain that the natural father's consent to the adoption is not required if he had failed, for at least one year, *"significantly without justifiable cause"* to communicate with or to provide for the care of his children. An objective analysis of this case leads to the inescapable conclusion that it cannot be said that the natural father has forfeited his right to object to the adoption of his children.

Finally, Ark. Stat. Ann. § 56-214 (Repl. 1977), in material part, provides:

"The petitioner and the individual to be adopted shall appear at the hearing on the petition, unless the presence of either is excused by the court for good cause shown."

The petitioner-stepfather testified at the hearing on his adoption petition resulted in the Interlocutory Decree granting the adoption:

"Q. Where are the children this morning?

A. . . . in school . . .

Q. Why didn't you bring them?

A. I wasn't instructed to."

The presence of the children was mandatory under the statute. The failure to have the children present for the proceeding amounts to a jurisdictional defect rendering the interlocutory decree a nullity. The majority seeks to avoid this defect by asserting that the final decree recites: "1. That all the proper parties are before the Court."

I submit that this observation in the final decree, which is not supported by anything in the record, does not cure the obvious fatal defect because the final decree was entered *pro forma* to simply render the interlocutory decree final, which was entered December 28, 1977, while the final decree was entered November 18, 1978. In other words, the final decree was not rendered as a consequence of a hearing separate and apart from the original hearing resulting in the interlocutory decree. The interlocutory decree makes no reference as to the presence of the children whatsoever.

It seems clear that appellant-natural father's entitlement to due process and equal protection under the law dictates a reversal. It must be remembered that in a case, as here, involving former spouses, especially where it is obvious that emotions are at a high pitch, courts are duty bound to scrutinize claims of waiver in order to be sure there is no manipulation of the purported facts on the part of either party to the proceeding.

Accordingly, I dissent.