2012 Ark. App. 148

**Edward Irwin COURTNEY, Appellant**

v.

**Richard Lynn WARD II & Tessa Ward, Appellees.**

**No. CA 11–580.**

Court of Appeals of Arkansas.

Feb. 15, 2012.

Nicholas Matthew Churchill, Fayetteville, for appellant.

Johnnie Kay Emberton Rhoads, Rogers, for appellee.

DAVID M. GLOVER, Judge.

Appellant Edward Courtney and appellee Tessa Ward are the biological parents of an infant, a minor female, born June 16, 2008. The parties are now divorced, and Tessa has married appellee Richard Ward II. Richard and Tessa sought to have Tessa's daughter adopted by Richard without the consent of Edward. In an Interlocutory Decree of Adoption filed February 25, 2011, the Washington County Circuit Court granted the Wards' request for adoption, finding that Edward's consent was not necessary. Edward now appeals, arguing that (1) the trial court should have dismissed the petition for adoption for failure to state facts upon which an adoption could be granted without the consent of the biological father; (2) the trial court erred by refusing to allow him to testify about the conditions

of his parole; (3) the trial court's ruling was based on erroneous findings of fact; (4) the trial court did not have jurisdiction to grant the adoption because the person to be adopted was not present and no finding was made that the presence of the person to be adopted should be excused; and (5) |₂the Wards failed to meet their burden of proving by clear and convincing evidence that Edward failed to contact or support his minor daughter without justifiable cause for a one-year period. We affirm.

### Facts

Tessa and Edward were married in January 2006 and separated in May 2008. Their daughter was born June 16, 2008. In August 2008, after Tessa told Edward that she wanted a divorce, Edward threatened to kill Tessa. According to Tessa, Edward had been violent toward her during her pregnancy, and on the day he threatened to kill her, he also attempted to run her off the road (which Edward denied). Edward subsequently pleaded guilty to terroristic threatening and felony failure to appear and was sentenced to ten years' incarceration with five years suspended; he served a total of fifteen months in prison, from January 4, 2009, until April 1, 2010. After the August 2008 incident, Tessa obtained a no-contact order against Edward; according to her, he did not obey it. Edward testified that one of the conditions of his suspended sentence was that he have no contact with Tessa other than by court order.

Tessa and Edward were divorced on December 15, 2008; Tessa was given custody of their daughter. Edward did not appear for the divorce hearing but was ordered to pay forty-five dollars per week in child support. The trial court determined that, due to Edward's failure to appear and Tessa's allegations of Edward's drug use and violent behavior, he was awarded no visitation at that time but could petition the court in the future to institute visitation. The divorce decree provided notice to Edward that nonpayment of child support |₂for one year and no visitation for one year were grounds for termination of parental rights.

Tessa and Richard married on September 2, 2009, and the child resides with them in Springdale. Tessa and Richard filed their first petition for Richard to adopt Tessa and Edward's daughter in October 2010 (it was dismissed on November 8, 2010). On October 27, 2010, Edward then filed a petition seeking visitation in their divorce proceeding. Tessa and Richard refiled their petition for adoption on January 4, 2011. The cases were consolidated for trial.

Edward testified at length in support of his position. He said that he petitioned for visitation because he wanted to be a part of their daughter's life. He admitted that he had previously had a drug problem but asserted that he had been clean for two years. He stated that he had last seen their daughter, who was two-and-a-half years old at the time of the hearing, when she was four months old, although it was his testimony that he had tried many times to visit her but was thwarted by Tessa. He testified that he wrote their daughter letters while he was incarcerated. When Edward began to testify that no contact with Tessa and her family was a part of his parole order, an objection was lodged on the basis of the best-evidence rule with regard to him testifying about the conditions of his parole. Then, when Edward attempted to introduce the written conditions of his parole, an objection was made on the basis that the document was not properly authenticated; the trial court sustained this objection.

When asked why he did not contact their daughter after he was released from prison, Edward testified that he did not want to bring her into an unstable environment and that he wanted to get on his feet before bringing her into his life. He testified that he began paying child support on October 28, 2010, the day after he filed his petition for visitation, and that he was current on his child-support payments. Then, on cross-examination, he testified that, although he was employed and had been since shortly after his release from prison in April 2010, he did not begin paying any child support until after being served with the petition for adoption, and that the first child support he paid was eighty dollars in November 2010.

Edward said that he took no action to assert his visitation rights until after he was served with the petition for adoption because he was not financially stable enough to do so. He stated that he was also not aware that he had the right to petition for visitation at any time that he was not incarcerated.

Edward testified that, prior to the divorce decree being entered, he had two or three visitations with his daughter that were supervised by Tessa's mother or grandmother; this testimony was disputed by both Tessa and her mother. He also said that he repeatedly tried to call Tessa while he was incarcerated.

Tessa and her mother both testified. Tessa said that Edward did not provide any support for their daughter from before her birth until November 2010. She disputed Edward's testimony that he exercised visitation two or three times prior to the divorce; she said that he exercised visitation once, and her mother and grandmother supervised the visit. She denied that Edward tried to see their daughter on numerous occasions after he was released from prison, stating that he did not com-municate with her or any member of her family. She testified that Edward did not file a petition for visitation until after she and Richard filed their initial petition for adoption. Tessa also disputed Edward's contention that he wrote numerous letters to their daughter, stating that she had received only two letters (which she brought to court and entered into evidence). She said that the last time Edward visited with their daughter was in September 2008, and that, after their divorce in December 2008, she did not receive any communication from him regarding visitation until she was served with his October 27, 2010 petition for visitation. Tessa said that Edward never requested pictures of their daughter, he did not send gifts to her, and neither he nor his extended family ever inquired about her.

Tessa's mother, Jean Collins, stated that she supervised one visitation between Edward and his daughter and that it was supposed to be a two-hour visitation; however, Edward arrived fifteen minutes late and stayed for only an hour and fifteen minutes. She said that during that time, Edward mainly attempted to question her about Tessa instead of visiting with his daughter. Collins said she set up several visitations after the first visit, but Edward did not attend. She testified that Edward called her on one occasion when she was out of town wanting to see his daughter the next day, and she told him that it would have to be done the following week; Edward proceeded to "cuss" her and told her that she was not going to tell him when he could see his daughter. She did not supervise any visitations after that point.

At the close of the hearing, the trial court found that it had been proven by clear and convincing evidence that Edward had not seen his daughter since he was released from prison in 2010; that he nev-

er sought the aid of the court for visitation until after Tessa and Richard's initial petition for adoption was filed; that he had paid a total of $200 in support for his daughter ($80 in November 2010, $120 in December 2010, and zero in 2011); that prior to going to prison, he did not have a job and gave no excuse for not having a job; that he did not support his daughter prior to going to prison and did not provide support after being released from prison until the Wards filed an adoption petition; that even though he testified he tried to make calls and no one would talk to him, he did not seek visitation through the court; and that Tessa and her mother were more credible than Edward with regard to his attempts to contact his daughter. Furthermore, with regard to the two letters entered into evidence by Tessa from Edward, the trial court found that one of the letters, although addressed to his daughter, was actually a letter to Tessa, and that Edward had sent his daughter only one letter in February 2009. The trial court further found that while Edward claimed that he had done his best to communicate with his daughter, it did not believe him. The trial court found that the Wards proved that Edward had failed significantly without justifiable cause to communicate with his child and to provide for the care and support of his child; that it was in the best interest of the child for her biological father's parental rights to be terminated and the adoption to be granted; that Edward's consent was not necessary; and that Edward's petition for visitation was moot and was dismissed.

### Trial Court's Failure to Dismiss Adoption Petition for Failure to State Facts

Edward filed a motion to dismiss the Wards' petition for adoption based on Rule 12(b)(6) of the Arkansas Rules of Civil Procedure, arguing that the petition failed to state or allege particular facts upon which an adoption could be granted under Arkansas law. Specifically, Edward alleged that the Wards did not present facts in their petition for adoption that Edward had failed to communicate with or support his daughter without justifiable cause. The trial court denied Edward's motion to dismiss. Edward now argues on appeal that the trial court erred in denying this motion. We find no merit in this argument.

Except for certain situations not present in this case, *see University of Ark. for Med. Sciences v. Adams*, 354 Ark. 21, 117 S.W.3d 588 (2003), the denial of a motion to dismiss an action is not a final, appealable order from which an appeal may be taken because it does not dismiss the parties from court, discharge them from the action, or conclude their rights to the subject matter in controversy. *Epperson v. Biggs*, 17 Ark.App. 212, 705 S.W.2d 901 (1986). We find that two out-of-state cases provide excellent explanations as to why a denial of a motion to dismiss based on Rule 12(b)(6) is not an appealable order. In *Stanton & Associates, Inc. v. Bryant Construction Co., Inc.*, 464 So.2d 499, 504–05 (Miss.1985) (citations omitted), the Mississippi Supreme Court held:

> Stanton contends that the trial court's refusal to dismiss Bryant's complaint for failure to state a claim, Rule 12(b)(6), Miss. R.Civ.P., constitutes an error which is not only reviewable on this appeal but of reversible proportions.
>
> . . . .
>
> Rule 12(b)(6) has supplanted the demurrer in our civil practice. It provides that a plaintiff's complaint may be dismissed for "failure to state a claim upon which relief can be granted."

The issue of whether the denial of a Rule 12(b)(6) motion can be the subject

of an appeal once a final order has been entered poses a question of form and logic, not substance. The types of matters within the office of a Rule 12(b)(6) motion are necessarily proper bases—at subsequent stages of the action—for: (1) a motion for summary judgment; (2) a motion for a directed verdict, (3) a request for peremptory instruction, (4) a motion for j.n.o.v., and (5) sometimes a motion for a new trial. The substantive objections first raised in a Rule 12(b)(6) motion, therefore, merge into these subsequent motions and retain no separate procedural identity once the Rule 12(b)(6) motion has been denied.

At first glance, it would appear that Stanton's couching this assignment of error in terms of a Rule 12(b)(6) motion was merely a mistake of form—Stanton should have assigned whatever substantive ground was contained in its Rule 12(b)(6) motion in its motion for j.n.o.v., and then appealed the denial of *that* motion to this Court. In other words, the substance of Stanton's Rule 12(b)(6) assignment of error could ordinarily be re-couched in a new and acceptable form. But this is not the case.

. . . .

Stanton fails to perceive that the *denial* of a Rule 12(b)(6) motion will almost *never* be a proper subject of an appeal. After final judgment has been entered, the only appeal lies from the overruling of defendant's motion for j.n.o.v. (asserting the same substantive ground as is contained in the Rule 12(b)(6) motion). While it is conceptually possible that an interlocutory appeal may lie from the denial of a Rule 12(b)(6) motion, we expect that the cases will be rare indeed when the criteria for the granting of such an interlocutory appeal will be met. More specifically, the refusal of the trial judge to grant a Rule 12(b)(6) motion

made on grounds the complaint is just too sketchy, its allegations too vague, is *never* appealable. Faced with such a complaint, the defendant has several options (other than appeal). He may move for a more definite statement. Ordinarily, it will be more practicable for the defendant to utilize discovery to unveil the details of the plaintiff's claim. A defendant may insist on a more precise statement of the plaintiff's claim at a pretrial conference, for ordinarily the allegations and denials of pleadings ought to be deemed merged into the pre-trial order. Finally, a defendant may lie in wait for the plaintiff to offer at trial evidence deemed beyond the scope of the pleadings and spring forward with an appropriate objection (which, ordinarily, will be overruled by the trial judge who thought the complaint sufficient in the first place, or at best will be met by plaintiff's motion to amend, which generally will be—and ought to be—granted).

In *Concrete Service Corp. v. Investors Group, Inc.,* 79 N.C.App. 678, 340 S.E.2d 755, 757–58 (1986) (citations omitted), *cert. denied,* 317 N.C. 333, 346 S.E.2d 137 (1986), the North Carolina Court of Appeals held:

The Supreme Court recently held that the denial of a motion for summary judgment is not reviewable on appeal from final judgment:

The purpose of summary judgment is to bring litigation to an early decision on the merits without the delay and expense of a trial when no material facts are at issue. After there has been a trial, this purpose cannot be served. Improper denial of a motion for summary judgment is not reversible error when the case has proceeded to trial and has been determined

on the merits by the trier of the facts, either judge or jury.

The denial of a motion for summary judgment is an interlocutory order and is not appealable. An aggrieved party may, however, petition for review by way of certiorari. To grant a review of the denial of the summary judgment motion after a final judgment on the merits, however, would mean that a party who prevailed at trial after a complete presentation of evidence by both sides with cross-examination could be deprived of a favorable verdict. This would allow a verdict reached after the presentation of all the evidence to be overcome by a limited forecast of the evidence.

This same logic should apply to denials of motions to dismiss based on an alleged failure to give notice of facts stating a claim.

A motion to dismiss under G.S. 1A–1, R.Civ.P. 12(b)(6) generally tests the legal sufficiency of the complaint: Has the pleader given notice of such facts as will, if true, support a claim for relief under some legal theory? An incorrect choice of legal theory should not result in dismissal where the pleader has given sufficient notice of facts concerning the wrong complained of. The motion does not present the merits, but only whether the merits may be reached. As the United States Supreme Court has stated with respect to the similar provisions of F.R.Civ.P. 12(b), "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." When following denial of the motion the court has proceeded to the merits and the fact-finder has found they support the claim, whether the initial ruling was technically correct becomes insignificant. The policy behind the Rules of Civil Procedure is to resolve controversies on the merits, not on technicalities of pleading. This is especially true in light of the liberal pleading now allowed, the relatively free availability of amendments, and the affirmative duty of the opponent to object to evidence as outside the pleadings.

Other jurisdictions support our view. "It is an almost universal rule that a verdict will cure defects in the pleadings unless the substantial rights of the adverse party have been prejudiced." This rule was applied in *Morgan v. Roper*, 250 S.C. 280, 157 S.E.2d 572 (1967), the court holding that defendants could not complain that the trial court overruled their demurrer following judgment on the merits against them.

In the case at bar, the Wards prevailed on their petition for adoption, and the denial of Edward's motion to dismiss pursuant to Rule 12(b)(6) now becomes insignificant. As stated in *Stanton & Associates, supra*, the substantive objections first raised in a Rule 12(b)(6) motion merge into subsequent motions such as a motion for summary judgment, a motion for a directed verdict, a request for peremptory instruction, a motion for j.n.o.v., or sometimes a motion for a new trial and retain no separate procedural identity once the Rule 12(b)(6) motion has been denied.

### Conditions of Parole

Edward contends that the trial court erred in not allowing him to testify about the conditions of his parole. In discussing our standard of review for evidentiary rulings, we have said that trial courts have broad discretion and that a ruling on the admissibility of evidence will not be reversed absent an abuse of that discretion. *Grove v. Grove*, 2011 Ark. App. 648, 386 S.W.3d 603. During Edward's testimony, the introduction of the written

conditions of his parole was objected to by the Wards' counsel because they were not properly authenticated; the trial court sustained that objection. Edward's attempt to testify about the conditions of his parole was also objected to by the Wards' counsel on the basis of the best-evidence rule, which was also sustained. Edward now argues that the mere fact that the terms of the conditions of his parole were put into writing does not make testimony regarding the terms inadmissible under the best-evidence rule. We disagree. The best-evidence rule comes into play when the contents of a writing or its exact wording is an issue in the case. *Lin Mfg. Co. of Ark. v. Courson*, 246 Ark. 5, 436 S.W.2d 472 (1969). The contents of Edward's conditions of parole were at issue in the case, as Edward was attempting to claim that the reason he had not visited with his daughter was because he could not contact Tessa or her family as a condition of his parole. Edward was unable to introduce the written conditions because he did not have a witness to authenticate the document, and he could not therefore testify to the terms of the document because the written document was the best evidence.

*Erroneous Findings of Fact*

Edward further contends that the trial court made erroneous findings of fact and relied on those erroneous findings in determining that his consent was not required for his daughter's adoption. First, he argues that the trial court erroneously found that he made child-support payments in November and December 2010, but that he did not make any support payments in January and February 2011. He argues that his testimony was that he was current on payments, and that testimony was not rebutted. He points to the fact that the payment history submitted by the Wards was only through January 4, 2011. We find no error. While he did testify that he was current, the trial court was not required to believe him. The Wards submitted payment documentation through January 4, 2011—if Edward wanted to prove that he was current past that date in his child-support payments, it was his duty to submit documentation proving that he was current through the date of trial.

Edward also argues that the trial court erroneously found that Tessa's and her mother's testimony did not lend any credibility to his claims that he made constant attempts to contact his daughter because Tessa testified that Edward called her "all the time" during his incarceration but that she never spoke to him. However, there was never any testimony about what Edward was calling Tessa about—certainly there was testimony that he was obsessed with Tessa, but there was no testimony that he was calling to check on their daughter or to talk to her. In fact, Edward told Tessa's mother that he did not need anyone to tell him about his daughter. We find no error.

Lastly, Edward contends that the trial court erroneously found that he went to prison for threatening the lives of his wife and child. He asserts that there is no evidence that he was ever incarcerated for threatening the life of his child. While this is technically true, there was testimony that the child was in the vehicle with Tessa when Edward was on the phone with Tessa threatening to kill her and attempting to run them off the road. Furthermore, Edward does not dispute that he went to prison for threatening Tessa's life. This simply does not provide a basis for reversal.

*Lack of Jurisdiction—Person to be Adopted Not Present*

Arkansas Code Annotated section 9-9-214(a) (Repl.2009) provides, "The peti-

tioner and the individual to be adopted shall appear at the hearing on the petition, unless the presence of either is excused by the court for good cause shown." Edward states that his daughter was not present at the hearing on the petition for adoption and the trial court did not excuse her presence, and because adoption statutes are strictly construed, the adoption must be reversed. In support of his contention, he cites Judge Howard's dissent in *Brown v. Fleming*, 266 Ark. 814, 586 S.W.2d 8 (Ark.App.1979), in which testimony clearly indicated that the children were not present before the court. Judge Howard wrote, "The presence of the children was mandatory under the statute. The failure to have the children present for the proceeding amounts to a jurisdictional defect rendering the interlocutory decree a nullity." *Id.* at 824, 586 S.W.2d at 12. While Edward concedes that he did not raise this argument below, he argues that an objection based on jurisdiction can be raised at any time, even on appeal, citing *Hogan v. Durgan*, 11 Ark.App. 172, 668 S.W.2d 57 (1984).

Edward is mistaken that this is a jurisdictional defect that requires strict compliance. *See Martin v. Martin*, 316 Ark. 765, 875 S.W.2d 819 (1994). Arkansas Code Annotated section 9–9–205(a)(1) (Repl.2009) provides, "The state shall possess jurisdiction over the adoption of a minor if the person seeking to adopt the child, or the child, is a resident of this state." While consent is also a jurisdictional question, *see Martin, supra,* this is a case in which the petitioners proved that consent was not required. Because Edward's argument is not jurisdictional, and because this argument is being raised for the first time on appeal, this court ₄will not reach the merits of the argument. It is well settled that the appellate courts will not consider arguments made for the first

time on appeal. *Teris, LLC v. Chandler,* 375 Ark. 70, 289 S.W.3d 63 (2008).

### Clear and Convincing Evidence to Support Adoption

Our court set forth the appellate standard of review for adoptions in *In re A.R.,* 103 Ark.App. 1, 3–4, 285 S.W.3d 716, 717–18 (2008) (citations omitted):

> Adoption proceedings are reviewed de novo. Adoption statutes are strictly construed and a person wishing to adopt a child without the consent of the parent must prove that consent is unnecessary by clear and convincing evidence. A circuit court's finding that consent is unnecessary due to a failure to support or communicate with the child will not be reversed unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. We defer to the trial court in making credibility determinations because the trial court is in a better position to judge the credibility of witnesses.

Consent to adoption is not required of a parent of a child in the custody of another, if the parent for a period of at least one (1) year has failed significantly without justifiable cause (i) to communicate with the child or (ii) to provide for the care and support of the child as required by law or judicial decree. Ark.Code Ann. § 9–9–207(a)(2) (Repl.2009). The party seeking to adopt a child without the consent of the natural parent bears the heavy burden of proving by clear and convincing evidence that the party failed significantly and without justifiable cause to communicate with the child. *Taylor v. Hill,* 10 Ark.App. 45, 661 S.W.2d 412 (1983). Justifiable cause means that the significant failure must be willful in the sense of ₅being voluntary

and intentional; it must appear that the parent acted arbitrarily and without just cause or adequate excuse. *Id.*

In *Vier v. Hart,* 62 Ark.App. 89, 968 S.W.2d 657 (1998), this court held that a father's failure to communicate with his child was unjustified in spite of his claim that his failure to visit was due to the fact that the mother and her new husband did not permit visitation. The mother in *Vier* did not make efforts to let the father know her address and did not return a message from him, but the father never sought court intervention to obtain visitation.

 Here, by Edward's own testimony, he had not seen his daughter since approximately September 2008. Even though he was in prison from January 2009 until April 2010, the trial court found that he had sent only one letter to his daughter. Although Edward testified that he sent numerous letters, only two were presented in court, and those were presented by Tessa. One letter was actually determined by the trial court to have been sent to Tessa instead of their daughter. Additionally, even though Edward testified that he made numerous calls to Tessa that she did not accept, the trial court did not find that testimony to be credible. Even if the trial court had found that Edward made some calls to Tessa that were not returned, *Vier* holds that does not necessarily equate to communication with the child. Furthermore, as in *Vier,* Edward did not seek court intervention to gain visitation rights with his daughter, even after he was released from prison.

Furthermore, it is undisputed that Edward made absolutely no child-support payments for his daughter until November 2010, over two years after she was born. While it is true that Edward was in prison from January 2009 until April 2010, even assuming that his imprisonment constituted justifiable cause (a finding not spe-cifically made by the trial court), he made no support payments from June 2008 until January 2009, and he made no payments after being released from prison in April 2010 until November 2010, after he received the initial adoption petition. The trial court's findings that Edward failed significantly without justifiable cause for a period of at least one year to communicate with his daughter or to provide for her care and support are not clearly erroneous.

Affirmed.

VAUGHT, C.J., and GRUBER, J., agree.