SLIP OPINION

# ARKANSAS COURT OF APPEALS

DIVISIONS I, II, and IV
**No.** CV–14–1080

| | |
|---|---|
| ANTONIO MARTINI<br>APPELLANT | **Opinion Delivered** December 2, 2015 |
| V. | APPEAL FROM THE FAULKNER<br>COUNTY CIRCUIT COURT<br>[NO. 23PR–2013–441] |
| CHRISTOPHER PRICE<br>APPELLEE | HONORABLE H.G. FOSTER, JUDGE<br><br>AFFIRMED |

## RITA W. GRUBER, Judge

This is an adoption case in which the natural father of the adopted child is appealing from the trial court's order granting the adoption petition of the child's stepfather. Appellant, Antonio Martini, brings two points on appeal: (1) the trial court erred in ruling that his daughter could be adopted without his consent, and (2) the trial court erred in finding that the adoption of a son, with whom appellant stood in loco parentis, was in the child's best interest without recognizing that his daughter's adoption was invalid. We affirm the trial court's decision.

The facts in this case are not in material dispute. Antonio is the former husband of Renita Price, who is the wife of appellee, Christopher Price. Renita is the mother of two minor children: a son, G.L., and a daughter, E.M. Antonio is the biological father of E.M. and stood in loco parentis to G.L. Renita and Antonio were married on July 4, 2006, and separated on December 5, 2009, when Antonio was arrested for domestic violence against

her. At the time of their separation, G.L. was five and E.M. was two. A no-contact order protecting Renita was entered against Antonio on December 6, 2009, by a trial court in Washington State, where the parties were then residing. Immediately after the event, Renita left Washington and returned with her two children to Arkansas, her home state and the residence of her mother. Renita testified that her mother had lived in a home in Kensett, Arkansas, for twenty-five years and that Antonio had been to this home at least twenty times or more. The Washington court accepted Antonio's guilty plea and sentenced him on March 25, 2010. At that time, the court entered another no-contact order protecting Renita from Antonio until March 25, 2012. The order did not prohibit Antonio from contacting the children.

In May 2012, Renita filed a complaint for divorce. The parties were divorced by a decree entered on October 26, 2012. The decree awarded visitation to Antonio at the discretion of Renita and subject to supervision by the children's therapist, who was to determine the times, location, frequency, and type of contact. After six months, the parties and the therapist were to review the progress and assess a more permanent visitation schedule according to the therapist's recommendation. Antonio had two supervised visits with the children in 2012: one in November and one in December. He then saw the children in 2013 for family-therapy sessions on January 16, February 5, and March 26. After the March session, the therapist determined it was in the children's best interest to discontinue the sessions. Antonio began sending cards to the children in August 2013. Appellee filed an adoption petition to adopt E.M. on August 20, 2013, and an amended petition on

November 6, 2013, including a request to adopt G.L. also.

The relevant Arkansas statute provides that consent to adoption is not required of a parent whose child is "in the custody of another, if the parent for a period of at least one (1) year has failed significantly without justifiable cause (i) to communicate with the child." Ark. Code Ann. § 9-9-207(a)(2) (Repl. 2009). We construe adoption statutes strictly. *In re Adoption of Lybrand*, 329 Ark. 163, 169, 946 S.W.2d 946, 949 (1997). A person who wishes to adopt a child without the consent of the parent must prove that consent is unnecessary by clear and convincing evidence. *Id.* We review adoption proceedings de novo, *Hollis v. Hollis*, 2015 Ark. App. 441, at 6, 468 S.W.3d 316, 320, but we will not reverse a trial court's finding that consent is unnecessary unless it is clearly erroneous. *Lybrand*, 329 Ark. at 169, 946 S.W.2d at 949–50. The issue of justifiable cause is factual, but one that is largely determined on the basis of the credibility of the witnesses. *Id.* at 169, 946 S.W.2d at 950. We give great weight to a trial judge's personal observations when the welfare of young children is involved. *Id.*

The following principles apply in analyzing the consent statutes. A failure to communicate without justifiable cause is one that is "voluntary, willful, arbitrary, and without adequate excuse." *Id.* at 169–70, 946 S.W.2d at 950. Also, the one-year period may be any one-year period, not merely the one-year period preceding the filing of the petition for adoption. *In re Adoption of A.M.C.*, 368 Ark. 369, 377, 246 S.W.3d 426, 432 (2007). Finally, it is not required that a parent fail "totally" in these obligations in order to fail "significantly" within the meaning of the statute. *Id.*

3

SLIP OPINION

The crux of the issue here is not the time period between the parties' divorce and the filing of the adoption petitions, but the time between the parties' separation in December 2009 and October 2012, when the parties were divorced. Further narrowing the question before us, Antonio admits that he had only insignificant communications with the children during that period. He argues only that he had "justifiable cause" for his lack of communication.

The sole question before us is whether the circuit court clearly erred in determining that Antonio had no justifiable cause for his failure to communicate. The record shows that, between December 2009, when Renita and Antonio separated, and October 2012, when the divorce was granted, Antonio did not see the children at all. On August 10, 2010, Renita sent an email to Antonio telling him that the children would like to talk to him and that if he wanted to talk with them to please have his counselor in Texas call Renita at "(501) 852-XXXX." Neither Antonio nor his counselor called. On August 16, 2010, Renita sent an email to Antonio, again explaining that the children would like to talk with him, giving him an email address to use for the children, explaining that she would read his emails to them, and stating that they "would be thrilled to hear from you." She also mailed a letter with some pictures to Antonio in August, which had a return address of the Arkansas Department of Human Services, Division of Children and Family Services, where Renita was employed.

On August 22, 2010, G.L. sent an email to Antonio about his friends and his school. He told Antonio that he missed him and asked when Antonio was going to write to him. On August 25, 2010, in Antonio's first contact with the children since the separation in

4

December 2009, he replied to G.L.'s email, stating, "soon [G.L.]" E.M. also sent an email to Antonio on August 22 explaining that she had started "big girl" school, that she didn't cry when her "mommy" left her at school, and that she was the teacher's helper. She said that she missed him and asked him to "please write to me." Antonio responded on September 15, telling her happy birthday—E.M. was born on September 7—and that God would bring them all together soon. Antonio sent one more email in December 2010 to wish G.L. a happy birthday. Thus, Antonio's communication with the children during this three-year period consisted of three short emails in the fall of 2010, two of them in response to the children's emails to him.

Antonio contends that he had "justifiable cause" for two reasons: (1) he did not know where the children were located; and (2) he was under a no-contact order regarding Renita. Specifically, he claims that he did not contact Renita's mother in order to inquire about the children because of the no-contact order. He argues that he did not send emails or call the number provided by Renita due to his suspicion that he was being "set up."

First, with regard to the location of the children, we note that the parties were married in Arkansas and lived in Arkansas after they married. Renita testified that her mother had lived in a home in Kensett, Arkansas, for twenty-five years and that Antonio had been to this home twenty times or more. Further, by at least August 2010, when he received a letter from Renita with an Arkansas return of address and a phone number that his counselor could call with an Arkansas area code, he was on notice that the children were in Arkansas. The trial court could have found that this information certainly would have given him a

SLIP OPINION

place to start to establish communication regarding his children using a neutral party, his counselor, or legal counsel if he felt uncomfortable initiating such contact himself. All of this evidence was before the trial court.

Secondly, the no-contact order did not prevent Antonio from communicating with his children, only Renita. When asked about the letter from Renita with the Arkansas return address, Antonio said that he thought that it might have been "a state agency that was a go between" for communication. But he neither contacted the agency nor attempted to have his counselor or lawyer contact the agency to establish any communication regarding the children. The only evidence before the court that Antonio asked anyone about communicating with the children was his own testimony about what someone told him:

> COUNSEL: Why in the world did you not hire an attorney back in December of 2009, January of 2010, February of 2010, March of 2010 to take care of these visitation issues so that you wouldn't go two and a half years without seeing your kids?
>
> ANTONIO: While I was on probation?
>
> COUNSEL: Did your probation officer prevent you from hiring an attorney to settle some issues regarding visitation?
>
> ANTONIO: No, but you can't leave the State of Texas and they are not in Texas, and I know they are not going to be put on an airplane to come to Texas.
>
> . . . .
>
> COUNSEL: So, you could have hired an attorney in Arkansas, talked to him over the phone, and got to at least telephone or Skype visitation with your kids, in that time period.
>
> [Objection re: speculation/counsel agrees to rephrase question.]
>
> COUNSEL: Did you think about getting something like that set up?

6

> ANTONIO: Yes. I asked the probation officer and I did speak with an attorney, one of those initial ones at no cost and I was told by both, wait until your probation is over. You do that to open a can of worms and [you're] going to end up a loser in jail.

In response to his attorney's question regarding what his probation officer told him about sending emails to the children, Antonio testified as follows:

> ANTONIO: If I remember what the probation office said, as long as Renita is not communicating with me directly, she has to speak for a two-year-old or a five-year-old because they are not going to type the message and as long as I don't make any of my verbal to Renita or ask the kids about Renita, keep the conversation with [G.L.] about [G.L.] or [E.M.] and keep the conversation with [E.M.] by [G.L.] or [E.M.] keep it right there confine, you're okay.

Other than three terse emails, Antonio failed for almost three years to communicate with his children: not one card or letter; not a call to the state agency to attempt to establish communication or visitation; no legal intervention; nothing. Moreover, Renita did not thwart his attempts; rather, she attempted to facilitate communication. *See Vier v. Hart*, 62 Ark. App. 89, 968 S.W.2d 657 (1998) (finding it significant that father never attempted to effect his visitation through legal intervention and finding no clear error in trial court's finding that father's failure to communicate was without justifiable cause in spite of his contention that mother thwarted all of his efforts). Whether there was justifiable cause for that failure is a question of fact that is largely determined on the basis of the credibility of the witnesses, giving great weight to the trial judge's personal observations. *In re Adoption of Lybrand*, 329 Ark. at 169, 946 S.W.2d at 950. The trial court in this case determined that Antonio's excuses were either not credible or not sufficient to constitute justifiable cause. Given the evidence presented in this case, we cannot say that the trial court's determination is clearly erroneous.

In light of our decision on Antonio's first point, upholding the validity of E.M.'s adoption, we need not address his second argument regarding G.L.

Affirmed.

GLADWIN, C.J., and KINARD, WHITEAKER, and BROWN, JJ., agree.

ABRAMSON, HARRISON, HIXSON, and HOOFMAN, JJ., dissent.

**KENNETH S. HIXSON, Judge, dissenting.** The trial court, and now a majority of this court, has created a paradox for Antonio Martini ("Antonio"), the father of his four-year-old daughter, E.M. In the divorce/child custody case pending in Division I of the Circuit Court of Faulkner County, E.M.'s mother, Renita Martini Price ("Renita"), voluntarily agreed, and the court ordered, for Antonio to have visitation rights with his four-year-old daughter and Antonio was actively participating in those rights. Antonio would even have the right to petition for full custody of E.M. upon a showing of a material change of circumstances. Yet, simultaneously, across the Faulkner County courthouse in Division IV of the Circuit Court, Renita's new husband of only thirty days filed a petition to adopt Antonio's four-year-old daughter and terminate Antonio and E.M.'s father/child relationship forever. The two cases were subsequently consolidated to create an even greater paradox. During the divorce/child custody portion of the case with the trial court wearing his "circuit judge" hat, Antonio fully participated in the litigation and actively engaged in his court-ordered visitation with his daughter. However, when the trial court changed hats and wore his "probate judge" hat in the adoption portion of the case, Antonio was muted and did not

even have the right to withhold consent to the adoption of his own daughter despite the fact that he was entitled to, and was exercising, court-ordered visitation with her. Hence, the paradox: On the one hand, Antonio could exercise his parental rights in fighting for visitation or even custody in the divorce/child custody case, while on the other hand, Antonio could not even contest his daughter's adoption and termination of his parental rights in the adoption proceeding.

I would reverse the adoption as to Antonio's biological child, E.M., because in my view the trial court clearly erred in finding that Antonio's failure to communicate with E.M. for more than one year was without justifiable cause.[1] Therefore, I respectfully dissent.

On appeal from the adoption decree, Antonio admits that he had virtually no communication with the children for more than two years after Renita left the marital home in the state of Washington and moved with the children to Arkansas. However, Antonio argues that this failure to communicate was not without justifiable cause as required by the applicable statute. The thrust of appellant's argument is that he was under a two-year no-contact order issued by the Municipal Court in Snohomish County, Washington, through March 2012. It is undisputed that this valid and enforceable no-contact order prohibited Antonio from having direct *or indirect contact* with Renita, under the threat and specter of two years' incarceration in Washington State for a violation. Antonio argues that he was in effect unable to communicate with his two and four-year-old children because such communication

---

[1] I would affirm the adoption of G.L. because the trial court did not clearly err in finding that adoption to be in G.L.'s best interest. Antonio did not have the right to withhold consent for his stepson's adoption.

9

would necessarily, and in fact, involve direct or indirect contact with Renita which would be a clear violation of the no-contact order and subject him to potential incarceration.

During the two-year no-contact period, Antonio did not have the address or know the location of his children.[2] In Antonio's testimony he acknowledged that he received one letter from Renita in 2010. This letter did not contain a mailing address or disclose the location of the children. Instead, the return mailing address was from the Department of Human Services, by whom Renita was then employed. Antonio acknowledged receiving two or three emails from his children, which presumably had been typed and sent by Renita, and he responded to those emails. However, Antonio stated that, after receiving no further emails from Renita, he did not send any more emails because he thought Renita might be setting him up to violate the no-contact order. Antonio testified that, after this email exchange had occurred, Renita called his probation officers two or three times and had heated discussions with them, which resulted in the probation officers hanging up the phone on Renita. These exchanges between the probation officers and Renita prompted one probation officer to ask Antonio whether he had violated the no-contact order. Antonio further testified that he considered trying to set up telephone or Skype visitation with the children, but that both his probation officer and his lawyer advised against it, telling him that he would risk violating the no-contact order. Due to the children's young ages, such a visitation technique would necessarily involve, at a minimum, indirect contact with Renita.

---

[2] Antonio never knew the mailing address or location of the children during these proceedings. In fact, the trial court denied Antonio's request for Renita to reveal the location. Antonio was, therefore, unable to directly locate or communicate with the children.

SLIP OPINION

Parental rights are protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article 2, Section 8 of the Constitution of Arkansas. *Bush v. Dietz*, 284 Ark. 191, 680 S.W.2d 704 (1984). In *Matter of Adoption of Glover*, 288 Ark. 59, 702 S.W.2d 12 (1986), the supreme court said that the power of the court in adoption proceedings to deprive a parent of her child is in derogation to her natural right to the child, and that statutes conferring such power should be strictly construed. The law is solicitous toward maintaining the integrity of the natural relation of parent and child, and in adversary proceedings in adoption, where the absolute severance of that relation is sought, without the consent and against the protest of the parent, the inclination of the courts, as the law contemplates it should be, is in favor of maintaining the natural relation. *Glover, supra.*

The party seeking to adopt a child without the consent of the natural parent bears the heavy burden of proving by clear and convincing evidence that the parent failed significantly and *without justifiable cause* to communicate with the child. *Courtney v. Ward*, 2012 Ark. App. 148, 391 S.W.3d 686 (emphasis added). Under the particular facts presented in this case, I cannot agree with the trial court's decision that the petitioning stepparent proved by clear and convincing evidence that Antonio's failure to communicate with his daughter was without justifiable cause.

In this case, Antonio had a reasonable threat of a two-year prison term if he contacted the children because he would have had to contact the mother, directly or indirectly, to communicate with the young children. Antonio testified that he sought advice from an attorney and from his probation officer and that both advised Antonio to wait for the end of

11

the two-year probationary period to resume contact with the children. There is no indication in the record that there were any credibility issues with Antonio.

Two months after the two-year probation period had expired, Renita filed for divorce in Arkansas and sought custody of the minor children. The divorce decree was entered on October 26, 2012. The divorce decree granted custody to Renita and visitation rights to Antonio. The decree specifically stated that they needed to start visitation "to reestablish a relationship" between Antonio and the minor children and ordered that visitation should be gradual with a therapist. The decree also looked forward and provided that, after a six-month period, the parties should review the visitation progress and determine how visitation should proceed. At the time the decree was entered, Antonio resided in Katy, Texas. Antonio attended every scheduled counseling and visitation session, driving approximately ten hours each way. At some point during the visitation schedule, Antonio moved to Wichita, Kansas. Again, Antonio attended every counseling and visitation session, driving about seven hours each way. It appears to this jurist to be highly inconsistent to reestablish a relationship by agreement of the parents and under the authority and guidance of a court order and then, on the other hand, simultaneously find that the father does not even have to consent to stepparent adoption thereby losing all rights to his daughter.

The trial court's finding of the one-year period of lack of significant communication was also strained. The order of adoption was entered on June 20, 2014, which was over 27 months after the two-year no-contact order had expired. The trial court was required by statute to find a one-year period of a lack of significant communication between Antonio and his daughter to justify its ruling that Antonio was not required to consent to his daughter's

adoption. The Washington-State-imposed no-contact period expired on March 25, 2012. It is undisputed that there did not exist a one-year period of a lack of significant communication between March 25, 2012, and the date of the adoption on June 20, 2014. Therefore, in order to find a statutory lack of significant communication for a one year period, the trial court had to retroactively look back more than 27 months to find a one-year period. The only one-year period of a lack of communication occurred within the two-year Washington State no-contact period. It was during that subsequent 27-month overlooked period that Antonio was driving from Katy, Texas, and Wichita, Kansas, exercising his court-ordered visitation and counseling and "reestablishing the relationship" with his daughter.

Justifiable cause means that the significant failure must be willful in the sense of being voluntary and intentional; it must appear that the parent acted arbitrarily and without just cause or adequate excuse. *Courtney, supra.* Given the undisputed fact that Antonio was under a no-contact order that prohibited him from contacting his wife in any fashion, directly or indirectly, during the more-than-one-year period he failed to communicate with his daughter under threat of incarceration, and his daughter was too young to be contacted directly, and other reasons set forth herein, I would reverse the finding that Antonio's consent to her adoption was not required. It is uncertain whether attempts to contact the children would have actually resulted in a violation of the no-contact order and incarceration for two years, but in my view, these circumstances provided an adequate and justifiable excuse (one that was not arbitrary) for Antonio's lapse in communication. Because the trial court clearly erred in

finding that Antonio's failure to communicate was without justifiable cause, I would reverse the adoption of Antonio's biological child, E.M.

ABRAMSON, HARRISON, and HOOFMAN, JJ., join in this dissent.

*Tripcony, May & Assoc.*, by: *James L. Tripcony*, for appellant.

*Shannon L. Holloway*, for appellee.