2010 Ark. App. 729

**Deborah D. BERGMAN, Appellant**

v.

**DIRECTOR, DEPARTMENT OF WORKFORCE SERVICES and Randolph County Nursing Home, Appellees.**

**No. E 10–10.**

Court of Appeals of Arkansas.

Nov. 3, 2010.

Larry Joe Steele, Walnut Ridge, for appellant.

Phyllis A. Edwards, Little Rock, for appellees.

JOSEPHINE LINKER HART, Judge.

We previously remanded this case to the Arkansas Department of Workforce Services Board of Review because it failed to make findings on Deborah D. Bergman's assertion that she was denied due process by the hearing officer's refusal to allow her to present one of her character witnesses. The Board of Review found against Bergman on this issue. She appeals that ruling, arguing that she was denied due process because the hearing officer, after limiting her to a single character witness, refused to allow her to call the witness of her choice and limited her cross-examination of the employer's witness regarding positive remarks in Bergman's evaluations. She also argues that there was insufficient evidence to support the Board of Review's decision to deny her unemployment benefits. We affirm.

Jennifer Kaczmarski, the Director of Nursing at Randolph County Nursing Home, testified that one of the other nurses, Amanda Wallace, who was one of Kaczmarski's three nieces who worked at the home, reported that Bergman had neglected to change a bandage on a patient and that it appeared that she was not giving eye drops to some of the patients. Kaczmarski contacted her direct supervisor, Paula Swift, and the RN supervisor and quality assurance coordinator, Amanda Wallis, to assist her in trying to determine if resident care was being compromised.

Prior to Bergman's shift, Wallis counted certain over-the-counter medications on Bergman's medicine cart and then counted

medications after the shift. She then compared how many doses should have been given with the amount of medication that remained on the cart. Kaczmarski claimed that they discovered discrepancies, but they could not determine which patients had failed to receive these medications.

Wallis and Kaczmarski then decided to use eye drops to "pinpoint" which residents were not receiving their treatments. According to Kaczmarski, each patient had their own, labeled, eye-drop bottle, which was used for that patient alone. On April 6, 2008, prior to Bergman's shift, Wallis removed three eye-drop bottles from the cart to see if Bergman would replace the medications. After the shift, the bottles had not been replaced. However, on the Medication Administration Record (M–A–R), the patient's individual record of medications received, Bergman had indicated that she gave the eye drops to three out of the four patients. They also had the night nurse mark a bandage that Bergman was required to change during her shift. Afterward, they discovered that Bergman had not changed the bandage, but likewise had made a chart entry to the contrary.

Kaczmarski confronted Bergman with her findings. With regard to the patient who was not documented as having received drops, Bergman explained that "the resident was erratic throughout the day" and that she "accidentally" omitted giving the drops. However, according to Kaczmarski, when she told Bergman that the patient's drops were not even on the tray, "she sat back in the chair and didn't say anything." When Bergman was asked about two other patients that she had charted as having received eye drops, Bergman claimed that she did not administer the drops because the patients were in the dining room for breakfast and she intended to administer the drops later.

Kaczmarski offered Bergman the opportunity to resign, but she refused.

Kaczmarski presented the employee-evaluation forms that she had prepared for Bergman for June 21, 2007, both of which reflected problems with Bergman's documentation. However, Kaczmarski explained that those comments reflected incomplete documentation, whereas the situation in question involved falsifying records. The hearing officer restricted cross-examination of Kaczmarski regarding certain positive entries on the evaluations as well as a comment that Bergman was "sometimes tactless." The hearing officer reasoned that the line of questioning was not relevant. She noted, however, that she had the evaluations in her possession and had read them. Kaczmarski emphasized that Bergman was not discharged because she had made medication errors, but rather because she deliberately falsified the patient charts. Paula Swift testified to substantially the same facts as Kaczmarski.

Bergman denied admitting that she falsified the documentation on the patients' M–A–R. She explained that she failed to notice the absence of eye drops for one of the patients because she did not attempt to administer the medicine due to the patient being "combative." Regarding the other patients, Bergman claimed that they were in the dining room and that she intended to give the drops later, but forgot. Further, she noted that she had several disagreements with Kaczmarski, which would account for her supervisor's motivation to terminate her employment.

Bergman planned to present the testimony of two character witnesses: former state representative Harmon Sewell and her former teacher and high school principal, Paul Dismang. Initially, the hearing officer expressed her intention to not allow any character witnesses, asserting that "it

really serves no purpose." However, Bergman's counsel successfully argued, "Her credibility has been put at issue, her honesty and her testimony here today, her credibility is the sole issue." The hearing officer allowed Bergman to call only one character witness. Bergman chose Sewell. The nursing home objected to Sewell being allowed to testify because he was a former state representative. Over Bergman's due-process objection, the hearing officer allowed Bergman to call only Dismang.

Dismang testified that he was Bergman's teacher and school principal approximately twenty years before her firing. He also had observed Bergman attending to patients when he visited his mother at the nursing home. Dismang stated that he never saw "Ms. Bergman do anything inappropriate towards the patients at the nursing home." Dismang further testified that Bergman "has a very good reputation in the community and she is trustworthy." He also stated that Harmon Sewell told him that Bergman was "an honest person" and that was the reason why he wanted to help her.

The hearing officer concluded that Bergman was disqualified for receiving unemployment benefits because she was discharged from her employment for misconduct in connection with her work on account of dishonesty. That finding was upheld by the Board of Review, and Bergman timely appealed to this court.

■ On appeal, we review the findings of the Board of Review and affirm if they are supported by substantial evidence. *Walls v. Director,* 74 Ark.App. 424, 49 S.W.3d 670 (2001). Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Id.* We review the evidence and all reasonable inferences deducible therefrom in a light most favorable to the Board's findings. *Lovelace v. Director,* 78 Ark.App. 127, 79 S.W.3d 400 (2002).

Citing *Smith v. Everett,* 276 Ark. 430, 637 S.W.2d 537 (1982), Bergman first argues that she was denied due process because she was denied her right to call her "first choice," Harmon Sewell, as a character witness. She also contends that she was denied the opportunity to fully cross examine Kaczmarski concerning her positive annual reviews of Bergman.

■ We believe that Bergman's reliance on *Smith* is misplaced. In *Smith,* the employer's witness presented testimony by affidavit. The *Smith* court held that a claimant was denied the minimum requirements of due process when he was denied the right to subpoena and cross-examine *adverse* witnesses in administrative proceedings, as was required by the United States Supreme Court in *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). Bergman was afforded these rights. While the better practice would have been to allow both character witnesses to testify, we hold that the hearing officer's decision does not compel us to reverse this case.

■ The Due Process Clause does not guarantee a party the right to unlimited process, but rather, guarantees that a party receives the "rudimentary elements of fair play." *Henderson State University v. Spadoni,* 41 Ark.App. 33, 848 S.W.2d 951 (1993). Generally, the concept of "rudimentary elements of fair play" has been interpreted to mean reasonable notice of the specific charges, the right to employ counsel if so desired, and the opportunity to confront adverse witnesses, speak in one's own defense, and call defense witnesses, including character witnesses. Bergman was afforded these rights. While the hearing officer's decision to not allow Bergman to present all the testimo-

ny that she felt was important to her case is mystifying—the nursing home's objection to Sewell's testimony was clearly not valid—Bergman was nonetheless allowed to present character evidence, including hearsay about what Sewell intended to testify. Given the extremely limited nature of character evidence, which is the reputation of that person in the community, we hold that the hearing officer's decision to exclude Sewell's direct testimony did not violate Bergman's right to due process. As our supreme court observed, due process requires a fair trial, not a perfect one. *Roleson v. State*, 277 Ark. 148, 640 S.W.2d 113 (1982). Likewise, although the hearing officer limited Bergman's cross-examination of Kaczmarski regarding Bergman's "positive" evaluations, those evaluations were nonetheless entered into evidence and supposedly read by the hearing officer.

Bergman next argues that the evidence was insufficient to support the denial of unemployment benefits. She contends that the fact that the omitted medications were available on her medicine cart and that her "ten years of self criticism, the job performance evaluations, and her reputation for truthfulness and honesty provided by her other character witness who was allowed to testify, overwhelm the accusations." We disagree.

Misconduct is defined in unemployment compensation jurisprudence as (1) disregard of the employer's interests; (2) violation of the employer's rules; (3) disregard of the standards of behavior which the employer has a right to expect of his employees; or (4) disregard of the employee's duties and obligations to the employer. *Maxfield v. Director*, 84 Ark. App. 48, 129 S.W.3d 298 (2003). Mere unsatisfactory conduct, ordinary negligence, or good-faith errors in judgment or discretion are not considered misconduct

unless they are of such a degree or recurrence as to manifest wrongful intent, evil design, or an intentional disregard of the employer's interests. *Id.* In addition, dishonesty is defined as "a disposition to lie, cheat or defraud; untrustworthiness; lack of integrity." *King v. Director*, 80 Ark. App. 57, 60, 92 S.W.3d 685, 686–87 (2002) (quoting *Olson v. Everett*, 8 Ark.App. 230, 231, 650 S.W.2d 247, 248 (1983)).

Here, the essence of Bergman's argument is that the evidence preponderates in her favor. This argument does not comport with our standard of review. As noted previously, we review the evidence and all reasonable inferences deducible therefrom in the light most favorable to the Board's findings. *Lovelace v. Director*, *supra*. We hold that Kaczmarski's and Swift's testimony about their investigation and discovery that Bergman had intentionally falsified the charts of several patients constitutes substantial evidence. We do not even consider whether Bergman's version of the events was more worthy of belief. In our review, we do not pass on the credibility of the witnesses; it is a matter that is left to the Board of Review. *Maxfield v. Director, supra.*

Affirmed.

ROBBINS and GRUBER, JJ., agree.