

# ARKANSAS COURT OF APPEALS

DIVISION IV
No. E-12-317

| | |
|---|---|
| ETHAN O. MOODY<br>APPELLANT | **Opinion Delivered** February 19, 2014 |
| V. | |
| DIRECTOR, DEPARTMENT OF<br>WORKFORCE SERVICES, AND<br>ARKANSAS HIGHWAY &<br>TRANSPORTATION DEPARTMENT<br>APPELLEES | APPEAL FROM THE ARKANSAS BOARD<br>OF REVIEW<br>[NO. 2011-BR-01205]<br><br>AFFIRMED |

## WAYMOND M. BROWN, Judge

Appellant appeals from the Board of Review's (Board) decision to affirm the Appeal Tribunal's (Tribunal) denial of benefits to claimant under Arkansas Code Annotated section 11-10-514(a) on finding that the claimant was discharged from last work for misconduct in connection with the work. We affirm.

Ethan Moody was a crew leader with the Arkansas Highway and Transportation Department (AHTD). The position of Finish Grader became available in his crew. Moody's direct supervisor, Ricky Sharp, intended to give the position to the current rough operator on his crew. Moody believed that person was incapable of performing the duties required of the finish grader position. He informed Sharp's supervisor, Bruce Street, of his belief that the position should not be given to the particular employee Sharp had in mind. Moody asserted that the rough grader's current level of work was bringing crew morale down and "it was gonna [sic] hit the fan" if Sharp promoted him to the vacant

position. Street advised Sharp that he and Moody should resolve the issue between the two of them. Due to Moody's assertions, Sharp decided to interview the crew individually about the particular employee in an effort to see if they were in agreement with Moody. He began interviewing the crew on October 18, 2010.

At the conclusion of each interview, Sharp would ask if there was anything else the interviewee wanted to discuss. At the close of their respective interviews, Belinda Rogers and Rebecca Bohannon came forward with allegations against Moody. Rogers stated that in August 2010, she "felt something on the top of my boot in between my leg, and it run up my leg, high up on my leg, and I turned around and it was Odell L [sic] Moody."[1] She stated that Moody had a "flag paddle, putting it up between my legs."[2] She stated that she told him to stop, after which he left, and there had been no other occurrences like that since. Sharp testified that a fellow crew member, Elvis Garrett, acknowledged witnessing the paddle incident between Rogers and Moody. Bohannon alleged that on a day when she was wearing a coat, Moody told her if she didn't take off her coat, "you're going to sour the mike [sic] in those things," referring to her breasts.[3] She also alleged that Moody

---

[1]Moody was known on the job by his middle name, Odell.

[2]Bohannon made a similar allegation against Moody regarding a third party. Bohannon alleged that Moody used the paddle handle in a similar manner against Lisa Carlton, another female crew member. Carlton denied that it happened. The EEO found the allegation unsubstantiated; however the EEO report states that another employee stated that he saw Moody point the stick end of the flagging paddle toward Carlton's crotch area approximately three years ago.

[3]At the hearing, Moody asserted that he did not make the comment, but that she had "raised her shirt and exposed her breasts to the crew." Bohannon denied the allegation.

had patted her "on the cheek of [her bottom]" after giving her instructions and had stuck his finger in a hole in her pants twice. Both contacts were unwelcomed. According to the EEO report, Bohannon told Rogers about each of these three incidences shortly after they occurred. At a later date, Sharp brought the ladies in for a meeting with Street, to whom they repeated the same allegations.

Following the meeting, Street discussed the allegations with his supervisor, Linda Waite.[4] Street and Waite forwarded the allegations to the personnel department in Little Rock as required by policy. Waite also contacted James Moore in EEO on October 29, 2010, asking him to review the allegations and get back to them with findings thereon.

No one from the AHTD spoke with Moody during the investigation. This was due in part to Moody's being off on sick leave when Street and Waite turned the matter over to the EEO, and in part due to the AHTD no longer being involved in the investigation once it was turned over to the EEO. Once the allegations were turned over to the EEO, the EEO instructed Street and Waite to locate Moody and place him on leave without pay pending the outcome of the investigation. This was accomplished on November 2, 2010. When interviewed by Wanda Bynum of the EEO, Moody denied all the allegations. At the Tribunal's hearing, he attributed the allegations of Rogers and Bohannon to retribution for safety violations he had previously reported against them.[5] He

---

[4]Street refers to his supervisor as "Linda Waite" according to the hearing transcript; however, the record shows that his supervisor was named Lyndal Waits.

[5]Moody testified that he reported both Rogers and Bohannon to Sharp for swimming while they were on a job and Bohannon for hosing herself with an herbicide hose.

asserted that Garrett was retaliating against Moody because of Moody's prior decision to recommend another employee for a promotion over Garrett.

Upon completion of its investigation, the EEO found the allegations to be substantiated and determined that Moody would be terminated. Waite concurred with the EEO's recommendation to terminate Moody in an interoffice memorandum dated November 16, 2010. Moody was terminated November 29, 2010.

On December 27, 2010, the Department of Workforce Services (Department) issued a notice of agency determination denying Moody benefits under Arkansas Code Annotated section 11-10-514(a) on finding that Moody was discharged from last work for misconduct in connection with the work. Moody filed a timely appeal of this determination to the Appeal Tribunal. Following an in-person hearing on May 11, 2011, the Tribunal issued its decision which affirmed the Department. Claimant filed a timely appeal to the Board of Review. The Board affirmed the Tribunal. This timely appeal followed.

We do not conduct a de novo review in appeals from the Board of Review.[6] On appeal, we review the findings of the Board of Review and affirm if they are supported by substantial evidence.[7] Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion.[8] If fair-minded persons could reach the

[6]*Law Offices of Craig L. Cook v. Dir., Dep't of Workforce Servs.*, 2013 Ark. App. 741, at 1, ___ S.W.3d ___ (citing *Snyder v. Dire.r*, 81 Ark. App. 262, 101 S.W.3d 270 (2003)).

[7]*Bergman v. Dir., Dep't of Workforce Servs.*, 2010 Ark. App. 729, at 5, 379 S.W.3d 625, 628 (citing *Walls v. Dir.*, 74 Ark. App. 424, 49 S.W.3d 670 (2001)).
[8]*Id.*

Board's conclusions on the same evidence, we must affirm its decision.[9] We review the evidence and all reasonable inferences deducible from the evidence in the light most favorable to the Board of Review's findings.[10] Issues of credibility and the weight of evidence are matters for the Board to determine.[11]

On appeal, Moody argues that there was not sufficient evidence to support the administrative law judge's (ALJ) decision. Throughout his brief, Moody's counsel refers to the ALJ. We advise Moody counsel that there is no ALJ in an unemployment compensation matter. Accordingly, because the only hearing occurred before the Tribunal, we assume that the ALJ references are meant to refer to the Tribunal hearing officer, and we treat them as such.

In a related matter, we note that though Moody is appealing the Board's decision to affirm the Tribunal's decision, Moody's arguments are all erroneously directed at the hearing officer and the Tribunal's resulting decision. That decision was appealed to the Board, which affirmed in a separate decision; therefore, no basis exist for referring to the Tribunal's decision. Accordingly, we address the Board's decision only and determine whether there was sufficient evidence to support it.

A person will be disqualified for unemployment benefits if it is found that he was discharged from his employment on the basis of misconduct in connection with the

---

[9]*Law Offices of Craig L. Cook*, *supra*.

[10]*Id*. at 1–2, ___ S.W.3d ___

[11]*Id*. at 2, ___ S.W.3d ___ (citing *Ballard v. Dir., Ark. Dep't of Workforce Servs.*, 2012 Ark. App. 371).

work.[12] Misconduct is defined in unemployment compensation jurisprudence as (1) disregard of the employer's interests; (2) violation of the employer's rules; (3) disregard of the standards of behavior which the employer has a right to expect of his employees; or (4) disregard of the employee's duties and obligations to the employer.[13] Mere unsatisfactory conduct, ordinary negligence, or good-faith errors in judgment or discretion are not considered misconduct unless they are of such a degree or recurrence as to manifest wrongful intent, evil design, or an intentional disregard of the employer's interests.[14] In addition, dishonesty is defined as "a disposition to lie, cheat or defraud; untrustworthiness; lack of integrity."[15]

The AHTD's sexual-harassment policy defines sexual-harassment as "unwelcome … physical or verbal conduct of a sexual nature when … the harassment substantially interferes with an employees work performance or creates and intimidating, hostile, or offensive work environment." It specifically states that sexual-harassment can include joking; physical assaults, including inappropriate touching; and "language of a sexual nature including comments about a person's body or sexually degrading words to reference or describe an individual." A non-exhaustive list of inappropriate conduct

---

[12]*Coker v. Dir., Dep't of Workforce Servs.*, 99 Ark. App. 455, 262 S.W.3d 175 (2007) (citing Ark. Code Ann. § 11-10-514(a)(1) (Repl. 2002)).

[13]*Bergman v. Dir., Dep't of Workforce Servs.*, 2010 Ark. App. 729, at 5, 379 S.W.3d 625, 628 (citing *Maxfield v. Dir.*, 84 Ark. App. 48, 129 S.W.3d 298 (2003)).

[14]*Id.*

[15]*King v. Dir.*, 80 Ark. App. 57, 60, 92 S.W.3d 685, 686–87 (2002) (quoting *Olson v. Everett*, 8 Ark. App. 230, 231, 650 S.W.2d 247, 248 (1983)).



considered to be grounds for dismissal included non-compliance with department policy, derogatory acts, and sexually or otherwise harassing an employee.

The employees are not given a copy of the personnel manual which contains the sexual-harassment policy, but the employees have access to it and they are told to read the manual. On April 2, 2009, Moody signed an acknowledgement that he'd been advised of the policies therein and that he would "familiarize" himself with the information in the manual. Moody testified at the hearing that "I do agree with the policies, I signed every one of them. I read them all. I read the personel [sic] book from one end to the other[.]" Additionally, the employer goes over the sexual-harassment policy in a sexual-harassment course. Moody last completed the course on September 27, 2006. There is no doubt that Moody was very aware of the policies.

The totality of this case hinges on credibility. The only evidence to support Moody is his own testimony. Facts established by the testimony of an interested witness, or one whose testimony might be biased, cannot be considered as undisputed or uncontradicted.[16] While the testimony of such a witness may not be arbitrarily disregarded, a trier of facts is not required to accept any statement as true merely because so testified.[17]

On the other hand, the employer's case was multi-sourced. Two employees testified detailing four separate instances of sexual-harassment by Moody. The paddle

---

[16]*Burnett v. Philadelphia Life Ins. Co.*, 81 Ark. App. 300, 308, 101 S.W.3d 843, 849 (2003) (citing *Old Republic Ins. Co. v. Alexander*, 245 Ark. 1029, 1039, 436 S.W.2d 829, 835–36 (1969)).

[17]*Id.*

incident was witnessed by a fellow employee according to Sharp's testimony. We note that the sexual-harassment policy states that any employee believing he or she has been harassed "should tell the harasser to stop and/or report the behavior to his or her supervisor or another higher-up." However, Rogers stated that she didn't report the incident initially because she "worked with the man [Moody] everyday" and Bohannon stated that she didn't report initially because "he is a supervisor" and "it's kind of hard to."

Sharp's testimony and notes corroborated both Rogers's and Bohannon's testimony. Sharp arranged a meeting with his supervisor, Street, who heard Rogers's and Bohannon's allegations for himself. Street's testimony and interoffice memorandum corroborated their allegations. In accordance with department policy, Street spoke to his supervisor, Waite, and they contacted the EEO, which took over the investigation from that point. The EEO completed its own investigation and concluded that the allegations were substantiated. Waite agreed with the EEO's decision to terminate.

Moody now asks us to find his version of events more credible. He asks us to find that this case is the result of a conspiracy of his inferiors to get rid of him because he was a tough boss. We are precluded from doing so. In our review, we do not pass on the credibility of the witnesses; it is a matter that is left to the Board of Review.[18] Substantial evidence supports the Board's finding that the employer's evidence was credible. The sexual-harassment policy states that "[m]anagers and supervisors will be held personally accountable for ensuring that no form of … harassment occurs in the workplace."

---

[18]*Bergman*, 2010 Ark. App. at 7–8, 379 S.W.3d at 629 (citing *Maxfield v. Dir.*, *supra*).

SLIP OPINION

Substantial evidence shows that Moody was a perpetrator of harassment in the workplace. Accordingly, substantial evidence supports the Board's decision to affirm the Tribunal on finding that Moody was discharged from his last work for misconduct in connection with the work.

In support of his insufficiency claim, Moody alleges that the hearing officer failed to develop the record. The Board specifically addressed this claim below. In its decision, it stated:

> [T]here is no indication on the record that the hearing officer limited the hearing to one hour and fifteen minutes, as the hearing is more than one hour and twenty-eight minutes long. While the testimony of the employer's four witnesses and the claimant's cross-examination of those witnesses took up the majority of the time on the record, the claimant testified for approximately 26 minutes, was not prevented from testifying at any time in the hearing, and when the hearing officer asked if there was anything that the claimant cared to add before the close of the hearing, the claimant proceeded to testify uninterrupted for approximately nine minutes. The claimant was also allowed to offer additional testimony after the employer's closing statement.

We find no reason to disagree with the Board on this matter. Substantial evidence supports its conclusion; therefore, we find that the record was sufficiently developed.

We do not address Moody's due-process argument because it was not raised below. It is well settled that the appellate courts will not consider arguments made for the first time on appeal.[19]

Affirmed.
PITTMAN and WYNNE, JJ., agree.
*Larry J. Steele PLC*, by: *Larry J. Steele*, for appellant.
*Phyllis A. Edwards*, for appellee.

---

[19] *Courtney v. Ward*, 2012 Ark. App. 148, at 14, 391 S.W.3d 686, 694 (citing *Teris, LLC v. Chandler*, 375 Ark. 70, 289 S.W.3d 63 (2008)).