BART F. VIRDEN, Judge
Gayle Blanton appeals from the Arkansas Board of Review's (Board's) decision denying him unemployment benefits. The Board found that Blanton was discharged for misconduct in connection with the work. We hold that substantial evidence does not support the Board's finding of misconduct; therefore, we reverse and remand.
Board decisions are upheld if they are supported by substantial evidence.
*188 Martinez v. Dir. , Department of Workforce Services , 2015 Ark. App. 717, 478 S.W.3d 276. Substantial evidence is such relevant evidence that reasonable minds might accept as adequate to support a conclusion. Id. We view the evidence and all reasonable inferences deducible therefrom in the light most favorable to the Board's findings. Id. Even if the evidence could support a different decision, our review is limited to whether the Board could have reasonably reached its decision based on the evidence presented. Id. However, our function on appeal is not merely to rubber stamp Board decisions. Taylor v. Dir. , Department of Workforce Services , 2018 Ark. App. 442, 558 S.W.3d 420. Whether a claimant undertook an act of misconduct sufficient to prevent the receipt of unemployment benefits is a question of fact. Martinez , supra . In the unemployment-compensation context, misconduct is defined as "(1) disregard of the employer's interests; (2) violation of the employer's rules; (3) disregard of the standards of behavior which the employer has a right to expect of his employees; or (4) disregard of the employee's duties and obligations to the employer." Id. (quoting Moody v. Dir. , Department of Workforce Services , 2014 Ark. App. 137, at 6, 432 S.W.3d 157, 160 ). To constitute misconduct, however, there must be the element of intent. Taylor , supra . Mere inefficiency, unsatisfactory conduct, failure in good performance as the result of inability or incapacity, inadvertencies, ordinary negligence in isolated instances, or good-faith errors in judgment or discretion do not constitute misconduct. Id. There must be an intentional or deliberate violation, a willful or wanton disregard, or carelessness or negligence of such degree or recurrence as to manifest wrongful intent or evil design. Id. It is the employer's burden to establish misconduct by a preponderance of the evidence. Id.
At the September 26, 2018 telephone hearing, Blanton represented himself and presented no other witnesses. Saint Jean Industries, the employer, did not participate. The issue was whether the circumstances of the separation entitled Blanton to unemployment benefits within the meaning of Arkansas Code Annotated section 11-10-513 or -514 (Repl. 2012 & Supp. 2017).
Blanton testified that he worked as a sweeper/scrubber in Building 1, that he began his employment on July 5, 2017, and that his last day on the job was Friday, July 13, 2018. The following weekend he injured his back, his wife took him to the doctor on Monday (July 16), and he received a steroid shot and a prescription for muscle relaxers. The doctor's note reflected a return-to-work date of July 18. Blanton stated the medications did not work, and the pain seemed to get worse. He called the doctor on Tuesday (July 17); the doctor gave him another prescription and wrote another note, explaining Blanton needed to be off work until Wednesday, July 25. Blanton testified he was not getting any better, so his doctor ordered an MRI, which took place on Tuesday, July 24, and referred him to a neurosurgeon in Little Rock for a steroid shot in his "spine" rather than in his hip.
On July 24, Blanton and his immediate supervisor, Ashley, texted each other:
[From Blanton at 5:11 p.m.:] Hey Buddy, no news yet. Got MRI and say I need to go to a back specialist. Trying to get in to see a Little Rock but haven't called back yet. Don't know how long I will be off, do you need a note from doctor all along or wait till I can come back.
[Ashley's response at 6:51 p.m.:] Ten fo bubba. And I really don't know about the papers and stuff..... darrin the 1 that okays LOA and stuff like that ...
*189 Blanton explained that his wife works at the same place he did, and she took the first two doctor's notes to his immediate supervisor the day after receiving them. Blanton said Darren was Ashley's boss; Blanton never contacted Darren but believed that Darren knew what was going on.
Blanton testified that on Monday, July 30, he was released to return to work, but his wife came home that day and told him they hired another guy for his job. He said that this was how he found out he had been fired. He said he called the Human Resources office, and they confirmed he had been replaced.
He said he then signed up for unemployment and learned two or three weeks later that he had been fired for "no call/no show," which he said was totally wrong. The hearing officer asked him if he had called in each day he was absent, and he repeated that he had talked to Ashley on July 24, never heard back from anybody, and assumed everything was fine and he would just bring in the release note when the doctor told him he could return to work. He explained that he assumed this would be okay because he never heard any more about it; that he never talked to Darren about a leave of absence because with a leave of absence
you know you're going to be gone [a] certain day until a certain day, [and] I didn't know until I was released. That's why I had asked Ashley, you want me to keep bringing - because I had another day on that other one, that other note, and I asked him, "Do you want me to keep bringing these notes in?"
He explained that Ashley, Darren, and the plant manager knew he was dealing with back pain that prevented him from coming to work; that he alerted Ashley he was having an MRI and an additional shot; and that he did not consider his situation to be a leave-of-absence matter because he did not know the end date.
Included in the record was the personnel-policy manual, which provides in pertinent part:
1. Absences and Tardiness - In case of illness or other circumstances preventing you from reporting for work on time, you must give as much advance notice as possible, at least within an hour before your scheduled starting time. If you are unable to call personally, you must have a family member or friend call for you. The message must be left with a Supervisor or Manager: leaving a message with a co-worker is not proper notification. When an Employee is absent for three (3) or more consecutive days because of illness or injury, the Employee may be required, before being permitted to return to work, to present to Management a physician's statement certifying that the Employee is able to resume his/her duties without risk to any person and any limitations upon the Employee's ability to perform his/her duties without any such risk.
....
4. No Call, No Show - In any case of absence where the employee does not report to work, nor call in to report the absence and reason is subject to disciplinary action after one occurrence. On the second occurrence, or second consecutive day of the first occurrence, the employee will be considered voluntarily terminating employment.
Ordinary negligence or good-faith errors in judgment or discretion do not constitute misconduct. Taylor , supra . The employee's violation must be intentional or deliberate, *190 demonstrating a willful or wanton disregard or carelessness or negligence of such a degree or recurrence as to manifest wrongful intent or evil design. Id.
Here, the Board concluded that Blanton "was discharged due to no call/no shows subsequent to July 25, 2018." Saint Jean Industries had the burden of proving Blanton's conduct rose to the level of wrongful intent sufficient to disqualify him from receiving unemployment benefits but chose not to attend the hearing. The pertinent evidence showed Blanton was at work on Friday, July 13; he hurt his back the following weekend; and he contacted his immediate supervisor about his back problems and provided two doctor's notes covering the period July 16 through July 25, 2018. On July 24, before the expiration of his doctor's note, Blanton texted his immediate supervisor to let him know he was trying to get in to see a back specialist, he did not yet know how long that would take and asked if he needed to continue providing doctor's notes or just bring in the documentation when he was released to return to work. His immediate supervisor's response was "Ten fo bubba," reasonably signifying his understanding that Blanton's problem was not resolved, Blanton was still having tests and seeing doctors, and Blanton could not return to work until the problem was resolved. The supervisor's comment about Darren's being the one to okay "LOAs" was confusing at best. As Blanton testified, he did not consider his back-pain situation to involve a leave of absence. He had contacted his immediate supervisor and fully informed him of the situation in accordance with the personnel policy, and he never heard back from anyone with the company. Instead, his wife informed him that he had been replaced.
Reasonable minds could not accept the evidence presented as adequate to support a finding of misconduct under the circumstances of this case. Even viewing the evidence and all reasonable inferences deducible therefrom in the light most favorable to the Board's findings, we hold there is not substantial evidence to support the Board's conclusion that Blanton's actions constituted misconduct.
Reversed and remanded.
Harrison and Klappenbach, JJ., agree.