Cite as 2025 Ark. App. 601

# ARKANSAS COURT OF APPEALS

DIVISION II

**No.** E-25-99

| | |
|---|---|
| SAMANTHA BOYCE<br>                    **APPELLANT** | **Opinion Delivered** December 10, 2025 |
| V. | APPEAL FROM THE ARKANSAS<br>BOARD OF REVIEW<br>[NO. 2025-BR-00345] |
| DIRECTOR, DIVISION OF<br>WORKFORCE SERVICES<br>                    **APPELLEE** | REVERSED AND REMANDED |

## BRANDON J. HARRISON, Judge

The Division of Workforce Services denied Samantha Boyce unemployment benefits because, according to the agency, Samantha "resigned." Samantha was an employee with a twenty-three-year history[1] (fifteen as manager) for LeAnn Steffey Ellison's business called Steffey's Pizza, located on Main Street in Lavaca. Generally put, resignations foreclose benefits, Ark. Code Ann. § 11-10-513 (Supp. 2025), because they are seen as voluntarily leaving one's employment without good cause connected with the work. The Board of Review upheld the Appeal Tribunal's decision to deny benefits, which mirrored the desk-level denial. The Board of Review specifically held that Steffey "accelerated [Samantha's] resignation" because Samantha, while discussing work-related efficiencies and issues she was experiencing with employees in her capacity as manager, mentioned that she might need to

---

[1]The record shows an employment period at the pizza place from June 2002 to April 2025.

look for another job given the ongoing scene at the pizzeria. We reverse that decision and remand for a proper award of benefits.

Below are some of the facts, as summarized by the Board of Review, that came out during the hearing before the Appeal Tribunal. As so often happens, only Samantha (the employee) attended; and nothing she stated *under oath* before the hearing officer was rebutted by any witness. The following summary concerns a course of discussion that began, or was perhaps exacerbated, in late February 2025:

> [Samantha discussed with the owner] chronic tardiness of some employees, staffing issues, and ways to improve efficiency. [Samantha] indicated that if her suggestions had been followed, there would be greater efficiency, and her workload would be reduced. [Samantha] explained that some employees were constantly tardy. Sometimes, they operated with crew shortages. Inexperienced crew members would be working where more experienced individuals needed to be placed. [Samantha] explained that since she was there more than the owner, she knew more about where and when certain individuals needed to be assigned. According to [Samantha], the owner took no action regarding her complaints. [Samantha] indicated that the owner's attitude was that since nobody else was complaining, things were acceptable. [Samantha] testified that other workers were just afraid to complain because they feared retaliation. [She] also testified that she requested extra paid time off[, and she] testified that she had heard that another employee, who had only been there for 10 years, and had quit and returned in the past, was getting an extra week of paid vacation. This resulted in him getting the same amount of paid time off as [Samantha]. The owner refused to give [her] any extra paid time off and claimed that she could not afford it.

Nothing consequential seems to have happened until 2 April 2025. It was then that there was more back and forth between Samantha and Steffey about Samantha's sick child and perhaps more. The "more" is unknown to the Board of Review and to us. The next day, April 3, Samantha showed up at the pizzeria shortly before 8:00 am to open. She knew something was up because no other employees were present. But Steffey, the owner, was.

That's when she, in the Board of Review's words, "accelerated [Samantha's] resignation," which, in turn, fueled the completed denial of benefits.

For her part, Samantha steadfastly maintained from A to Z that she did not resign but was fired. She did so when she made her initial claim, when she filled out her form to the Appeal Tribunal, and during the related hearing. In the appeal form she wrote: "I did not 'give intention to resign.' I casually mentioned looking for another job as do many other employees there. I did not 'leave work voluntarily.' She fired me. Specifically asked for my key to the business and told me to leave. I have multiple texts to prove [indecipherable]." Samantha did so again during the hearing itself. The Appeal Tribunal record notes that Steffey neither appeared to testify under oath against the claim, nor did she submit any exhibits to support the "accelerated resignation" conclusion. Samantha, to the contrary, submitted statements and text messages from at least four people to support her appeal. The hearing officer acknowledged documents that ran into dozens of pages as he confirmed the Appeal Tribunal record before taking Samantha's testimony. To say that Samantha presented the hearing officer with all the information of record would be an understatement. It wasn't all about favorable text messages, written statements, and other documents, of course.

When specifically questioned over the telephone by the hearing officer, Samantha categorically denied resigning. Indeed, she was as certain about that as she was flabbergasted.

HEARING OFFICER: [D]id you quit the job?

SAMANTHA: I did not, and I'm honestly flabbergasted that that was the decision. I definitely did not quit. I had casually mentioned looking—needing to look for another job because things there had gotten so bad. Her and I had

had multiple conversations since February about things within the workplace that needed to be resolved that she turned a blind eye to. So, no, I (INAUDIBLE). I've never had to deal with unemployment before. I was at that job for almost 23 years. So the fact that I was fired in itself was shocking and overwhelming to me. Then having to deal with all the unemployment, and then to be denied and have to do this, is just—it's overwhelming.

HEARING OFFICER: Okay. Okay.

SAMANTHA: But no, sir, I did not. I showed up to work that day. My shift was supposed to start at 8:00, and I'm usually at least 10 minutes early because *I drop my son off at 4:00, and I go directly to work to get to work. I showed up ready, willing, fully capable of working that day, had my purse, had my lunchbox, and she was there waiting on me to fire me.* And that's why on my cover letter with what I mailed, I wanted her to have to supply a schedule because two other employees were also supposed to be present at work that day at 8:00, and they never showed up. I left Steffeys that morning about—after her and I had our full conversation about everything because I still kind of backpedaled and was like, you know, I can't believe like this is happening just because, you know, you can't resolve workplace issues. And so we did have a conversation. So I left there about 8:10, 8:15, and the two other employees who were supposed to be present at 8:00 still weren't at work. And I was like, you know, that's weird. I don't know how else to explain it other than the fact that she called or texted them and told them she was firing me and for them not to come to work until I was dismissed and I left the premises. But no, I showed up to work ready to work. Like had I decided to quit, *I would have given her a two-week notice.* (Emphasis added.)

There were more questions and answers to this general effect, including testimony on issues that Samantha (as manager) brought to Steffey's attention, etcetera. In the end, as we have said, the hearing officer ruled that Samantha had resigned and therefore was denied

4

benefits. We, however, are not persuaded that substantial evidence supports the denial. The record is as lopsided as the Tower of Pisa on the documents (in Samantha's favor). The testimony? Again, Steffey did not appear under oath to rebut one thing Samantha said under oath. No-shows get no extra credit.[2] Samantha unequivocally stated that she did not resign. And by all accounts she continued to stand her post and do her work—from February through early April when Steffey told Samantha to give up the pizzeria keys. All things considered, the Board of Review lacked a record on which it could reasonably conclude that Steffey "accelerated [Samantha's] resignation." That curious (if not entirely self-justifying) phrase cannot withstand scrutiny. *See Blanton v. Dir.*, 2019 Ark. App. 205, at 2, 575 SW.3d 186, 188 ("[O]ur function on appeal is not merely to rubber stamp Board decisions.").

There is no written letter of resignation, as is customary. (Especially between an employee/employer with a twenty-three-year relationship, one can reasonably conclude.) There is no oral statement purporting to give a formal two weeks' notice, either. While not dispositive, the absence cuts against the employer. What we do have is a clear and

---

[2]Hearing Officer: Okay. All right. Anything else before I close, ma'am? Samantha: [I] provided that cover letter, which I know she didn't participate in a conversation, and I asked her to provide a copy of the schedule for the date that I was fired. And I know she received this information, but since she didn't participate, she just doesn't have to provide that schedule? [I] mean like that's kind of what powerful evidence in my eyes that hey, I was there at 8:00 and two other employees were supposed to be there, they could have been potential witnesses but I think it's pretty obvious that she alerted them and told them not to show up to work that day. So I mean I feel like that's a red flag on her part that . . . her intention was to get rid of me. Hearing Officer: Well, your argument is part of the record. She's not here to argue otherwise. And so, you know, that helps your argument. (Colloquy cleaned up slightly for readability.)

5

unrebutted sworn statement by Samantha that she would have provided two weeks' notice had she intended to resign.

The timing issue also received short shrift; but it too supports Samantha. Though not crystal clear, it appears the troublesome phrase to the Board of Review was uttered in February 2025. Setting aside that a manager-level employee ought to be able to discuss her experience in an appropriate way and degree to a superior who has given that person high responsibility, what's clear is Owner Steffey was fine to permit Manager Samantha to continue running the pizza place for another month or more until April 3. (In the documentary part of the record there is mention of ongoing discussions for ten weeks.) The Board of Review reasoned there was some long, slow-burning resignation fuse that was conveniently "accelerated" by an April 2 discussion. That position fizzles out under a close reading of the record.

★  ★  ★

Dissatisfaction and disillusionment developed between employee and employer, and vice versa. At some point, Steffey had enough and fired Samantha. The propriety of that termination is not at issue. This case is about whether Samantha voluntarily left her work without good cause instead of being fired. Given this record, the Board of Review's decision that Samantha resigned instead of being fired is unreasonable and therefore mistaken. We reverse the denial and remand for an award of benefits.

Reversed and remanded.

VIRDEN, J., agrees.

GLADWIN, J., concurs.

6

*Samantha Boyce*, pro se appellant.

*Cynthia L. Uhrynowycz*, Associate General Counsel, for appellee.