BRANDON J. HARRISON, Judge
Carrie Lucas appeals the circuit court's order granting Tami and Adam Nutts' petition to adopt Lucas's biological daughter, J.N. Lucas argues that the circuit court erred in (1) finding that her consent to the adoption was not required because she failed significantly and without justifiable cause to communicate with J.N. and to provide child support and (2) finding that *809 it was in J.N.'s best interest to grant the petition for adoption. We affirm.
On 19 August 2016, the Nutts petitioned to adopt four-year-old J.N. The petition recited that the Nutts had been appointed guardians of J.N. in November 2013 and that Lucas, the child's mother, had significantly failed, without justifiable cause, to visit or support the child since then; thus, her consent to the adoption was not required. The petition also stated that they were physically and financially able to furnish suitable support and education for J.N. and desired to establish the relationship of parents and child.
In response, Lucas asserted that she had not failed to visit her child without cause and that the Nutts had willfully and intentionally refused contact between her and J.N. Lucas argued that her consent was required for an adoption and that the adoption would not be in J.N.'s best interest.
The circuit court convened a hearing on 7 August 2017. Sherry Gentry, a licensed social worker, testified that she performed a home study on the Nutt household and that the house was suitable and in good shape. She also testified that criminal-background checks and child-maltreatment checks on the Nutts were both clear. Gentry recommended that the adoption be approved.
Tami Nutt testified that she and her husband, Adam, had been married for twenty-one years and had lived in their present home for seventeen years. She said that they have four sons, ages five to twenty, who all live at home. She explained that she first met J.N. in August 2013 while working as a caseworker at a domestic-violence shelter. Lucas and J.N., who was one year old, were staying at the shelter because Lucas was having trouble with her husband, Brad Wells. While she was there, Lucas inquired about adoption agencies and said that she was not ready to be a mom. Lucas told Nutt that she (Lucas) had lived with her parents for the first three months after J.N. was born, but after her parents kicked her out, she lived in an abandoned building for five months. She also stayed on friends' couches. When Lucas arrived at the shelter, J.N. had no clothes that fit her and no shoes. Tami said that Lucas left the shelter around September 2 and asked Tami to take J.N. After speaking with her family, Tami agreed, and both Lucas and J.N. began living with the Nutts. Lucas moved out on October 20 and relocated to Springfield, Missouri. Lucas lived in several different places over the next few years, including at least three shelters in the Springfield area.
Tami testified that after moving, Lucas first visited J.N. approximately seven months later in May 2014. Lucas stayed for one night and did not show much interest in J.N. Her next visit was Easter weekend of 2015, approximately one year later. Again, Lucas was there for one night and did not interact with J.N. Lucas's third visit was in October 2015. Tami said that Lucas did not ask for visitation again until 2017 and that she (Tami) had never denied Lucas visitation. Tami also said that Lucas had never sent a Christmas present, a birthday present, or called J.N. on her birthday. Lucas had offered no financial support for J.N. until early 2017. According to Tami, Lucas did not see J.N. from October 2015 to January 2017; since then, she had seen J.N. four times. Tami also said that there were a few times that Lucas asked to visit but the family already had plans. But she agreed that she had never denied Lucas visitation or the opportunity to speak with J.N.
Tami explained that when J.N. came into her family's care, she did not laugh, did not play, was thin, and was not up to date on her shots. Now, J.N. is outgoing, *810 happy, and on a regular routine for napping, eating, bathing, etc. According to Tami, J.N. thinks that the Nutts are her parents and that their sons are her brothers. J.N. and their five-year-old son are especially close and have "grown up like twins." Tami said that J.N. was her "little girl" and that she did not know what she would do without her. Tami explained that she is currently a preschool teacher and that J.N. and her five-year-old son attend school next door.
On cross-examination, Tami said that Lucas was nineteen years old when she agreed to the guardianship. Tami also explained that she wanted to help Lucas and that she had expected Lucas to regain custody within a year. She agreed that she had told Lucas that she would keep J.N. for as long as it took for Lucas to get back on her feet. She also confirmed that she had taken J.N. to Lebanon, Missouri, to meet Lucas in July 2015.
Adam Nutt testified that he loves J.N. with all his heart and that they enjoy many activities together such as fishing, swimming, and riding the four-wheeler. He also said that he is willing and able to financially support J.N. for the rest of his life. He acknowledged that he had received a ticket for public intoxication two years ago but said he did not have a drinking problem and had no DWIs.
Lucas testified that she currently lives in Branson, Missouri, and that she is employed at Big Cedar Lodge. She explained that when the guardianship was created in October 2013, she did not have a car or any source of income, and she thought the guardianship was in J.N.'s best interest. It was her understanding that the temporary guardianship would allow the Nutts to take J.N. to the doctor and otherwise take care of her while she (Lucas) got back on her feet. Lucas agreed that Tami had not stayed in touch with her or made any effort to make sure she and J.N. had time together. She acknowledged that in the first half of 2014, she did not have a job and was living in women's shelters in Springfield. She recalled visiting J.N. "between May and July in 2014" but did not remember if she visited in October. She said that she called the Nutts "once or twice" in 2014 to speak to J.N. According to Lucas, she said something to Tami about wanting J.N. back in November 2015, and Tami said she (Lucas) was no longer welcome to stay with them during visits. Lucas said she thought she visited in January 2016 but was not sure. She denied ever going a full year without seeing J.N. and agreed that she had the feeling that Tami was making it difficult to see J.N. She also said the Nutts had never requested financial support but that she offered support sometime in 2016. Lucas stated that she always brought J.N. little gifts and had bought J.N. a tablet, some stickers, and a bracelet. She agreed that she was physically, mentally, and financially able to take care of J.N. and that she had family nearby to help her. Lucas said that granting the adoption was not in J.N.'s best interest because she loved and missed her daughter and "she needs the love of her real family in her life."
On cross-examination, Lucas said that she believed she had seen J.N. more than four times prior to 2017, but she had no proof of that or proof of any specific visit that was denied by the Nutts. She agreed that she had access to reliable transportation for the past three years. Upon questioning by the court, Lucas agreed that she worked fulltime in 2015 and 2016 and explained that she had not petitioned to terminate the guardianship at that time because she did not know it was a permanent guardianship. "I thought all I needed to do was just go visit a few times and then tell them that I was going to bring *811 her back up here to live with me." She also stated that she did not pay any support because she "figured they would ask me if they needed anything." She then agreed that she knew she should be paying money to support J.N. but said, "I didn't think about it, I guess."
At the end of the hearing, the circuit court made the following findings:
[C]onsent to an adoption is not required of a parent of a child in the custody of another if the parent for a period of at least one year has failed significantly without justifiable cause to communicate with the child. I find that I have to look and listen to the parties who testified, and there is some slight issue in that area. The Nutts are certain that during 2016 there was no visitation for twelve months or more. Carrie Lucas on the other hand says that might not be true but her recollection is extremely vague and she does not deny the truth, but says she thinks it might not be correct. And referring to the visitation, what I observed about that visitation is at least during the first couple of years Mr. and Mrs. Nutt went out of their way to try to assist Carrie Lucas with visitation. ... And they even allowed her to stay in their home through November of 2015. ... The visitations were sporadic. Oftentimes Carrie Lucas was late, and by just fifteen or twenty minutes. ... That doesn't show a lot of regard for the people that are helping her with her children. It doesn't even show regard for the child. That is not a good indication of a mother that is really sincere about doing the right thing by her child.
I then look at the obligation that a parent has to provide for the care and support of the child as required by law or judicial decree. And if they don't do that, they waive the right to just say I won't consent and stop the adoption. In this situation, in 2015 and 2016 there was income coming in. Certainly, it wasn't a lot of money. And even the first year she didn't have a car. She did the last year. But even then when she's got a car that's running, she's got income coming in, she's got relatively low rent, she could have sent some money. It might not have been a whole lot, but it's the kind of thing the law requires, and it's the kind of thing the Court expects out of concerned parents to reflect on your obligations as a parent.
The court found that while Lucas had improved her situation, she did not have the ability to provide a stable home, she had not recognized her financial obligations, and "visitation was less than I believe [she] should have had." The court concluded:
If I grant the adoption, I know the child will be in a loving, stable home ... I don't want this child to be in a continuing situation where there's no finality.... [W]hen it comes down to the best interest of the child, I've got to do what I think is the right thing, and that is I find myself deciding that [J.N.] is best off remaining with Mr. and Mrs. Nutt.
In its written order, the circuit court found that Lucas had failed significantly to visit and support her child for at least one year and that her consent to the adoption was not required. The court also found that the Nutts "are morally fit to have the custody of the child and [are] physically and financially able to furnish suitable support, nurture, and education for the child" and that it was in J.N.'s best interest that the adoption be granted. Lucas has appealed the circuit court's order.[1]
*812 On appeal, Lucas argues that the circuit court erred in finding her consent to the adoption was not required because she failed significantly and without justifiable cause to communicate with J.N. and to provide child support. She also argues that the circuit court erred in finding that it was in J.N.'s best interest to grant the petition for adoption.
I. Consent
Adoption statutes are strictly construed, and a person who wishes to adopt a child must prove that consent is unnecessary by clear and convincing evidence. Racine v. Nelson , 2011 Ark. 50, 378 S.W.3d 93. Clear and convincing evidence is defined as that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. Posey v. Ark. Dep't of Health & Human Servs. , 370 Ark. 500, 262 S.W.3d 159 (2007). A circuit court's finding that consent is unnecessary because of a failure to support or communicate with the child will not be reversed unless clearly erroneous. Racine, supra. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. Norton v. Ark. Dep't of Human Servs. , 2017 Ark. App. 285, 2017 WL 1948236. In resolving the clearly erroneous question, the reviewing court defers to the circuit court because of its superior opportunity to observe the parties and to judge the credibility of witnesses. Brumley v. Ark. Dep't of Human Servs. , 2015 Ark. 356, 2015 WL 5895440.
Arkansas Code Annotated section 9-9-207(a)(2) (Repl. 2015) provides that a parent's consent to adoption is not required of
a parent of a child in the custody of another, if the parent for a period of at least one (1) year has failed significantly without justifiable cause (i) to communicate with the child or (ii) to provide for the care and support of the child as required by law or judicial decree.
"Failed significantly" does not mean "failed totally." Racine , 2011 Ark. 50, at 12, 378 S.W.3d at 100 (citing Pender v. McKee , 266 Ark. 18, 582 S.W.2d 929 (1979) ). It only means that the failure must be significant, as contrasted with an insignificant failure. Id. It denotes a failure that is meaningful or important. Id. Justifiable cause means that the significant failure must be willful in the sense of being voluntary and intentional; it must appear that the parent acted arbitrarily and without just cause or adequate excuse. Courtney v. Ward , 2012 Ark. App. 148, 391 S.W.3d 686. Also important to note is that the one-year period may be any one-year period, not merely the one-year period preceding the filing of the petition for adoption. In re Adoption of A.M.C. , 368 Ark. 369, 246 S.W.3d 426 (2007).
A. Failure to Communicate
Lucas first asserts that the one-year period after which a parent may lose his or her right to consent to the adoption must accrue before the petition for adoption is filed. Manuel v. McCorkle , 24 Ark. App. 92, 96, 749 S.W.2d 341, 343 (1988). The guardianship was granted in November 2013; it is undisputed that Lucas saw J.N. in May 2014, April 2015, July 2015, and October 2015; and the adoption petition was filed in August 2016. Thus, she argues, there was never a period of one *813 year before the filing of the petition that Lucas did not see her child.
Lucas further argues that even if the Nutts had proved that she failed to communicate with J.N. for more than one year, that failure would have been justifiable. She admits that she struggled throughout 2014 but by the end of 2015, she had a job, a vehicle, and broached the subject of returning J.N. to her custody. At that point, Tami said that Lucas was no longer allowed to stay in their home during visits, and Lucas was not able to coordinate another visit until after the adoption petition had been filed. Lucas had also testified that Tami made it difficult to have visits even before the petition was filed. Lucas argues that "[t]he fact that she managed to visit as much as she did, despite her poverty, emotion[al] turbulence, and the wary hostility of Mrs. Nutt, indicates a great effort on the part of Ms. Lucas to remain in her child's life as much as she possibly could."
In response, the Nutts argue that the evidence showed that in the nearly three years between when the guardianship was granted and the petition to adopt was filed, Lucas visited only three times, did not send Christmas or birthday presents or cards, and called only a few times. The Nutts assert that this very limited contact constitutes a significant failure to communicate with J.N. They also disagree that such a failure was justified for financial reasons, as the evidence showed that Lucas had been employed and had a vehicle for at least two years prior to the hearing, and she had sufficient funds to hire an attorney.
As noted above, "failed significantly" does not mean "failed totally." Racine, supra. Lucas's argument focuses on whether she failed to see J.N. at all for any twelve-month period. But even conceding that Lucas may not have gone a full twelve months without seeing J.N., we hold that the circuit court did not err in finding that three or four visits between November 2013 and August 2016, and perhaps a few phone calls, was still a significant failure to communicate. We also hold that the circuit court did not err in finding that failure unjustifiable, as Lucas was employed and had a vehicle for at least two years before the commencement of the adoption proceedings. Even if Lucas could not visit in person, she could have called or sent letters or cards. Because we find no error on this point, we need not reach Lucas's argument regarding failure to provide support.
II. Best Interest
A circuit court's decision regarding the best interest of a child to be adopted will not be reversed unless it is clearly against the preponderance of the evidence, giving due regard to the opportunity and superior position of the circuit court to judge the credibility of the witnesses. Sanders v. Savage , 2015 Ark. App. 461, 468 S.W.3d 795. We give great weight to a circuit court's personal observations when the welfare of young children is involved. Id.
Lucas asserts that even if the Nutts had proved that her consent was not required, they failed to prove that the adoption was in J.N.'s best interest. Lucas cites Hollis v. Hollis , 2015 Ark. App. 441, 468 S.W.3d 316, in which this court affirmed the denial of an adoption petition. In finding that the child's father and stepmother had failed to prove by clear and convincing evidence that adoption by the stepmother was in the child's best interest, the circuit court found that the mother's failure to provide care and support had been due, in part, to financial hardship, which the mother was curing. In addition, the mother had attempted to send money orders, albeit to the wrong address, and *814 the child had a loving relationship with his maternal grandmother. This court held that the evidence demonstrated that the mother had made significant strides to improve her life and her relationship with the child, and giving due regard to the circuit court's credibility determinations, this court found that the circuit court's denial of the adoption was not clearly erroneous.
Lucas argues that this reasoning is on point with the case at bar. She asserts that although the circuit court did not find that Lucas was justified in failing to support J.N., it should have, and that Lucas has made significant improvements in her life. Lucas contends that, at best, the Nutts presented evidence that the guardianship was still necessary, but not that the relationship of mother and child should be legally severed.
The Nutts respond that the evidence that the adoption was in J.N.'s best interest was overwhelming. They cite J.N.'s progress and happiness since coming into their care and note that Lucas's only argument against best interest was that "[J.N.] needs the love of her real family in her life." The Nutts cite Lucas v. Jones , 2012 Ark. 365, 423 S.W.3d 580, in which a biological mother appealed the adoption of her daughter by her parents (the child's maternal grandparents) and argued that the grandparents "already had custody of the child under the guardianship order and that an adoption would not work a change in the status quo." Id. at 11, 423 S.W.3d at 586. In affirming the adoption, our supreme court held:
The evidence indicates that J.J. was faring well in appellees' care, and she was described as a "happy little girl." Now, age six, J.J. had lived with appellees since she was two years old. As the circuit court noted, appellees stepped into the breach to provide a home for the child. By contrast, appellant is a virtual stranger to her. Appellant's argument that an adoption was not necessary overlooks that an adoption would add certainty and permanency to the child's life.
Id. at 11-12, 423 S.W.3d at 586-87. Likewise, the Nutts contend, J.N. has been in their custody since she was one year old and is happy and healthy, and Lucas is a virtual stranger to her. The adoption allows certainty and permanency in J.N.'s life and was in her best interest.
We hold that the circuit court's best-interest determination was not clearly against the preponderance of the evidence. The Nutts are the only family J.N. has ever known, and J.N. has no real relationship with either Lucas or other members of Lucas's family. By granting the adoption, the circuit court has correctly and permanently placed J.N. with her "real family."
Affirmed.
Virden and Klappenbach, JJ., agree.

While the September 2017 order is an interlocutory decree of adoption, and the court entered a final decree of adoption approximately seven months later, Lucas was not required to amend her notice of appeal. Any decree of adoption is a final decree, whether it is interlocutory or final, if no subsequent hearing is required by the terms of that decree. In re Adoption Orders , 277 Ark. 520, 642 S.W.2d 573 (1982).