Cite as 2026 Ark. App. 117

# ARKANSAS COURT OF APPEALS
## DIVISION IV
### No. CV-25-123

| | |
|---|---|
| STEPHEN JONES | Opinion Delivered February 25, 2026 |
| APPELLANT | |
| | APPEAL FROM THE BENTON COUNTY CIRCUIT COURT |
| V. | [NO. 04PR-24-297] |
| WILLIAM PARNELL AND LINDSEY PARNELL | HONORABLE THOMAS SMITH, JUDGE |
| APPELLEES | REVERSED AND REMANDED |

**RAYMOND R. ABRAMSON, Judge**

A Benton County Circuit Court granted Lindsey and William[1] Parnell's petition for Tyler to adopt M.C., born November 22, 2017, over the objection of Stephen Jones, M.C.'s biological father. Stephen now appeals, arguing that the circuit court erred when it determined that (1) Stephen's consent was not required, and (2) it was in M.C.'s best interest to be adopted by Tyler. We reverse and remand.

## I. *Background*

M.C. is the biological son of Lindsey and Stephen. Lindsey and Stephen divorced on August 13, 2020. In the divorce decree, Stephen was granted supervised visitation with M.C. until Stephen completed a hair-follicle drug test and parenting classes. Stephen was also

---

[1]Throughout the record, William Parnell is referred to as "Tyler."

ordered to pay child support. On February 1, 2024, Lindsey and her new husband, Tyler, filed a petition of relative adoption in the Benton County Circuit Court. Stephen filed an answer objecting to the adoption, and a hearing occurred on September 20, 2024. At the hearing, Stephen, Tyler, Andrea Penner (licensed professional counselor), Tammy Jones (Stephen's mother), and Lindsey testified. The facts before the court are as follows.

Despite the court limiting Stephen's visitation to supervised visits until he completed the drug test and parenting class, Lindsey had Stephen pick up M.C. from daycare five days a week and take care of him, largely unsupervised, until she was off work, sometimes as late as ten o'clock in the evening. The text messages throughout this period show that Stephen was attentive and always picked up M.C. as requested and made sure that M.C. had eaten before he returned M.C. to Lindsey. On May 11, 2021, there was an instance in which Stephen was supposed to take M.C. to school; he had to stop at home to change, which upset Lindsey because she felt Stephen's home was not a safe environment for M.C. Stephen, however, continued to pick up M.C. after this event without issue. A couple of weeks later, in June, Stephen's work hours changed, and he could no longer pick up M.C. at 3:00 p.m. At Lindsey's request, Stephen asked his mother if she could pick up M.C., but she was also unable to. In response, Lindsey cut off Stephen's visitation with M.C., with or without supervision, alleging that she did not want M.C. to see Stephen until he completed his hair-follicle drug test and a parenting test, despite having let Stephen watch M.C. largely unsupervised for nearly a year.

Stephen kept in regular contact and repeatedly requested to see M.C. Lindsey often replied that the timing was not good for her and M.C. When Stephen pressed for another time when Lindsey and M.C. were available, Lindsey would not commit to any date. This continued throughout 2021, 2022, and 2023. In 2023, Lindsey wanted to change M.C.'s last name to her maiden name (Mooney) at M.C.'s school. Lindsey hinted that if Stephen agreed to the name change, she would allow him to see M.C. Stephen did not agree to the name change, and Lindsey continued to deny Stephen visitation. Text messages between Stephen and Lindsey, which were not disputed at the hearing, showed that the longest period Stephen went without asking about M.C. was from April 17 to August 11, 2022.

Stephen stated that he thought about hiring an attorney to help enforce his visitation, but he was unable to afford one. Stephen testified that during this period, he went to dozens of in-state and out-of-state music festivals to help promote himself as a new "DJ." Stephen conceded that during this period, he would pay to go to these festivals and often performed without pay just to get exposure. While Stephen's mother had helped him financially to the tune of over $5,000 in the last few years, Stephen wanted to pay for the attorney himself and did not want to ask her for money. Throughout this period, Stephen paid his court-ordered child support in the amount of $50 a week without fail.

At the hearing, Andrea Penner, a licensed professional counselor with twenty years of experience, testified as an expert witness for Lindsey and Tyler. She testified that she met with M.C. on two occasions. The first time was in May 2024 and then again a week before the hearing. Each session lasted one hour. Penner testified that M.C. sees Tyler as his father,

3

M.C. has a very strong relationship and connection with Tyler, and that it would be very traumatic for M.C. should Stephen be reintegrated back into his life.

Tyler testified that he had been a part of M.C.'s life since M.C. was about two years old. Tyler stated they have a good relationship, and M.C. recognizes him as his father. Tyler testified that he is able to financially support M.C. and considers M.C. to be his son. Tyler felt it would be too damaging to M.C. to bring Stephen back into the picture, and while he would follow any court orders, he did not think Stephen was good for M.C. because of his lifestyle.

Lindsey testified that she would receive gifts for M.C. from Stephen and his mother, but they would be months after the holiday and confusing for M.C. She also testified that because of this confusion, she did not tell M.C. who the presents were from. The text messages, however, belie Lindsey's testimony. Stephen requested to meet with Lindsey every year, either right before or right after the holidays in question, including Christmas, Valentine's Day, Easter, and M.C.'s birthday. Lindsey would not bring M.C. to the gift exchanges.

It is undisputed that Stephen did not complete his court-ordered parenting classes until November 2023 and did not obtain a hair-follicle test until April 2024—after the petition was filed.

The ad litem did not have a recommendation and instead deferred to the circuit court, stating, "You've seen all the texts. You can make a decision about whether the alienation occurred." After hearing all the testimony, the court ruled from the bench,

admonishing both Lindsey and Stephen: "You both have failed your kid." The circuit court noted that had Stephen brought Lindsey to court earlier, Lindsey would have been found in contempt for her refusal to allow him his court-ordered visitation. Despite this, the circuit court held that Stephen did not have a justifiable cause for not communicating with M.C. for a one-year period in the years leading up to the petition for relative adoption. Specifically, the circuit court cited how long it took Stephen to complete his parenting classes and his hair-follicle test. Furthermore, the circuit court, relying heavily on Penner's testimony, found that it was in M.C.'s best interest to be adopted by Tyler because reestablishing a relationship with Stephen would traumatize M.C.

## II. *Standard of Review*

The standard of review applicable to the issues in this case is well settled: adoption cases are reviewed de novo. *In re Adoption of A.P.*, 2021 Ark. App. 440, at 8, 638 S.W.3d 293, 299. The decision of the circuit court will not be reversed on appeal unless that decision is clearly erroneous. *Id.* A finding is clearly erroneous when, despite evidence to support it, the reviewing court is left with the "firm conviction that a mistake has been made." *Id.* at 9, 638 S.W.3d at 299. In resolving the clearly erroneous question, the reviewing court defers to the circuit court because of its superior opportunity to observe the parties and to judge the credibility of witnesses. *Brumley v. Ark. Dep't of Hum. Servs.*, 2015 Ark. 356.

## III. *Consent*

We first look at whether Stephen's consent is required because that is the dispositive issue. Ordinarily, the consent of a natural parent is required in an adoption case. Ark. Code

5

Ann. § 9-9-206 (Repl. 2020). However, this consent is not required "if the parent for a period of at least one (1) year has failed significantly without justifiable cause (i) to communicate with the child or (ii) to provide for the care and support of the child as required by law or judicial decree." Ark. Code Ann. § 9-9-207(a)(2) (Repl. 2020). A significant failure is "one that is meaningful or important" and is "unjustifiable if it is voluntary and intentional, i.e., arbitrary and without adequate excuse." *Gordon v. Draper*, 2013 Ark. App. 352, at 6, 428 S.W.3d 543, 546. A person who wishes to adopt a child must prove by clear and convincing evidence that consent is unnecessary. *In re Adoption of J.N.*, 2018 Ark. App. 467, at 7, 560 S.W.3d 806, 812. Clear and convincing evidence is defined as that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. *Posey v. Ark. Dep't of Health & Hum. Servs.*, 370 Ark. 500, 262 S.W.3d 159 (2007).

We view the issue of justifiable cause as factual but one that is determined largely on the basis of the credibility of the witnesses, and we give great weight to a circuit court's personal observations when the welfare of young children is involved. *Rodgers v. Rodgers*, 2017 Ark. 182, at 4, 519 S.W.3d 324, 327 (citing *In re Adoption of K.F.H.*, 311 Ark. 416, 844 S.W.2d 343 (1993)). "Without justifiable cause" means that the significant failure must be willful in the sense of being voluntary and intentional; it must appear that the parent acted arbitrarily and without just cause or adequate excuse. *In re Adoption of J.N.*, 2018 Ark. App. 467, at 8, 560 S.W.3d at 812. Recently, the majority in *In re Adoption of Minor Child*, 2024 Ark. App. 202, at 5, 686 S.W.3d 858, 862, stated that communication and visitation are not one and the same.

There is no dispute that Stephen paid child support consistently from the time of the entry of the divorce decree through the resolution of the case. The only issue before the court was whether he had failed to communicate with M.C. for a one-year period without justifiable cause. The evidence presented at trial shows that Stephen never went longer than four months without attempting to communicate with M.C. The text messages show that he requested visitation with M.C. no less than sixteen times and was rebuffed each time. The circuit court found him credible, holding: "If [Lindsey] would have come to this court, she would've been in contempt, especially for her response." The circuit court then went on to directly admonish Lindsey, stating that she was wrong about the withheld visitation, not informing M.C. who the gifts were from, and changing M.C.'s name at school without Stephen's consent. Specifically, the circuit court held, "The only thing that saves you is the fact he did not do what he was supposed to do in a timely manner." However, this is where the circuit court erred. The question is not "whether a parent could have done more; rather, it is whether the parent's efforts to establish a significant relationship, despite the other parent thwarting his or her efforts, were sufficient such that consent was not required." *In re Adoption of Minor Child*, 2022 Ark. App. 408, at 8, 653 S.W.3d 544, 549.

The fact that Stephen could have hired an attorney and tried to have Lindsey held in contempt does not invalidate the fact that Stephen repeatedly requested visitation with M.C. and was constantly rebuffed. Moreover, while it is indisputable that Stephen should have completed his hair-follicle drug test and parenting class far earlier than he did, he was still

7

entitled to supervised visitation. His failure to do these things does not justify Lindsey's indefensible alienation of M.C.

The text messages before the circuit court illustrate that Lindsey not only refused to allow Stephen visitation with M.C. once Stephen's work hours changed, but that she appeared to be on a campaign to alienate him from his son. For example, when Lindsey attempted to call Stephen at 4:42 in the morning and he did not answer, Lindsey told Stephen four minutes later that "I feel like you should just give up your parental rights because he doesn't know who you are and because you are just like an MIA sperm donor." Stephen had last seen M.C. just three days prior. After asking to see M.C. for over two years, Lindsey appeared willing to meet with Stephen at a trampoline park or a "normal park." Lindsey texted Stephen telling him

> We can go one day after school next week. Me and his dad will be there with him. He has no idea who you are so we will tell him ur name is harrison and jump if we go to the trampoline park or just play if we go to the normal park. No discussing anything with him. I just want him to have a good time & no getting upset.

This was just a few months after Lindsey advised Stephen that "[M.C.] never wants to [see Stephen] & Im not going to force him to do anything he doesn't want to do." and "When I bring you [Stephen] up [M.C.] doesn't want to visit." Finally, nearly every time Stephen texted Lindsey asking to see M.C., Lindsey would simply not respond to his text messages.

This court has previously held that such rebuffed attempts to see the child in question, even though the parties could have attempted court action, were sufficient justification to excuse a lack of communication. *See Goldman v. Walker*, 2025 Ark. App. 451,

at 11, 722 S.W.3d 797, 804. In sum, the circuit court clearly erred when it determined that Stephen's consent was not required because Stephen had a justifiable excuse for not having communication with M.C. for any one-year period before the resolution of the case.

Because we find that the circuit court erred when it determined that Stephen's consent was not required to grant the petition for relative adoption, we do not reach the merits of whether the adoption was in M.C.'s best interest. This court is cognizant of the difficulty that may occur with the reintroduction of Stephen into M.C.'s life; however, Lindsey cannot create the alienation and then use this alienation as support to remove Stephen from M.C.'s life permanently. Accordingly, for the reasons discussed, we reverse and remand.

Reversed and remanded.

THYER and BROWN, JJ., agree.

*Bradley Hull* and *Michael Graugnard*, for appellant.

One brief only.